## COMMONWEALTH vs. RICHARD B. MODICA.

Middlesex.   May 14, 1987. — June 15, 1987.

Present: GREANEY, C.J., DREBEN, & KASS, JJ.

*Search and Seizure*, Probable cause, Threshold police inquiry, Consent. *Evidence*, Other offense. *Practice, Criminal*, Assistance of counsel, Argument by prosecutor.

In a criminal case, where police officers, having received an anonymous tip that was corroborated by investigation, had specific and articulable facts to warrant their suspicion that stolen property was being transported in a certain automobile, a stop of the vehicle for purposes of a brief threshold inquiry was permissible. [338-339]

Where, in a criminal investigation, three men in a motor vehicle, in the course of a permissible investigatory stop, gave inconsistent and incredible answers to inquiries of a police officer who had prior knowledge of the commission of a crime, probable cause to arrest them arose. [339-340]

At a hearing on a motion to suppress evidence, the judge was warranted in concluding that the driver of a vehicle, stopped by police for a permissible threshold inquiry, gave valid consent to the police to open a box he was transporting, which contained stolen property. [340]

There was no abuse of discretion in the admission at a criminal trial of testimony that items of stolen computer equipment had been discovered at the defendant's father's apartment, in order to demonstrate the defendant's knowledge that a certain box that he carried from the apartment contained stolen computer equipment. [341-342]

At a criminal trial, remarks during the prosecutor's closing argument did not improperly subvert the defendant's right to remain silent nor did they improperly imply the defendant had other witnesses he was afraid to call. [342]

At a criminal trial where the only issue disputed by the defendant was his knowledge that certain property was stolen, a stipulation by defense counsel that the property was in fact stolen did not support the defendant's claim on appeal that his counsel had been ineffective. [342-343]

COMPLAINT received and sworn to in the Malden Division of the District Court Department on December 22, 1983.

On appeal to the jury session of the Cambridge Division, a pretrial motion to suppress evidence was heard by *Wendie I. Gershengorn*, J., and the case was tried before *Paul P. Heffernan*, J.

*Steven J. Rappaport* for the defendant.

*Ellen M. Caulo*, Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. Following trial by a six-person jury in a District Court, the defendant, a lawyer, was convicted of receiving stolen property (computer equipment stolen from Rockport High School) and was sentenced to a one-year term of probation. He has appealed from the judgment and the denial of his motion for new trial. Represented by new counsel on appeal, he alleges error in the denial of his motion to suppress, in the admission of certain evidence at trial, and in the prosecutor's closing argument. He also argues that his trial counsel provided him with ineffective assistance.

Drawing principally on the findings of fact made by the judge who heard the motion to suppress, see *Commonwealth* v. *Gil*, 393 Mass. 204, 211-212 (1984), we summarize the circumstances of the seizure of the computer equipment. In August and October of 1983, the Ipswich police department investigated breaks involving computer equipment stolen from Ipswich High School and another school in Ipswich.

On December 19, 1983, about 8:30 P.M., the principal of Ipswich High School received a telephone call from an anonymous well-spoken man who stated: "If you want to get your equipment back, call the Wakefield police and have them stake out 37 Aborn Street and 22 Eaton Street [Wakefield] for a couple of days and you should be able to get it back." The principal promptly made contact with the Ipswich police.

Also on December 19, 1983, a computer and accessories were stolen from the nearby Rockport High School. The Rockport police, while investigating the break, saw tire tracks and also discovered that the thief (or thieves) had gained entry to the school through a window leading to the gymnasium ceiling and then had fallen or jumped to the floor about twenty-five feet below. Blood found on the floor led the investigating

officers to suspect that the person, or one of the persons, involved in the break had been injured during the entry. Measurement of the size of the tire treads and distance between tire tracks of the car disclosed to the police that a mid-size car probably had been involved in the crime.

Inspector Theodore J. LeMieux of the Ipswich police was the chief investigating officer for the Ipswich breaks. On December 20, 1983, the Ipswich police were notified of the Rockport thefts, and Inspector LeMieux was furnished with the serial numbers of the stolen computer equipment.

Acting on the tip, the Ipswich police consulted with the Wakefield police. The Wakefield end of the investigation was headed by Inspector Arthur O'Keefe. That investigation revealed that an Aborn Street did not exist in Wakefield but that an Aborn Avenue did. A Modica family resided at 37 Aborn Avenue. Persons named Modica also resided at 23 Eaton Street (not 22 Eaton Street as in the tip). Learning of these facts, the police decided to conduct surveillance of the two Modica addresses. Inspector LeMieux and another officer watched the Aborn Avenue address while Officer Daniel L. Moriarty of the Ipswich police watched the Eaton Street home.

The surveillance began on December 20, 1983, and lasted from approximately 4:00 P.M. to 10:00 P.M. Nothing was seen during that period at either house. Surveillance resumed on December 21, 1983. Inspector LeMieux drove by the Eaton Street address at 4:15 P.M. and observed a beige Plymouth "Scamp" (a mid-size car) parked in the yard. A little after 6:00 P.M. Officer Moriarty saw three men emerge from 23 Eaton Street. Two of the men were carrying a cardboard box large and strong enough to contain a computer. A third man followed on crutches. Despite the facts that it was dark outside and that the path was covered with snow, no outside lights were turned on to guide the men from the house to the car. The two men carrying the box looked back and forth several times in a furtive manner. The two men placed the box in the back seat of the car, the third man entered the car's rear seat, and the men left in the car. Moriarty made contact with LeMieux and O'Keefe, and a radio message went out directing that the car be stopped.

Officer James Moccia of the Wakefield police, who was on cruiser duty, spotted the car and pulled it over as it was about to leave the town limits of Wakefield. Moccia quickly ascertained that the driver was Kevin Flynn, checked Flynn's license and the registration for the car (both were in order), and waited for the other officers (LeMieux, O'Keefe, and Moriarty) to arrive.

When these officers arrived, Inspector O'Keefe, the officer coordinating the investigation, appears to have taken charge. He recognized Flynn, the driver of the car, as someone with whom he had gone to high school. He recognized James Dulong, the front seat passenger, as the man on crutches and as someone who had previously been arrested for breaking and entering and for drug offenses. He also recognized the defendant as an attorney with whom he was slightly acquainted.

As he approached the car, Inspector O'Keefe noticed the defendant seated in the rear seat next to the box. The defendant was clutching his briefcase to his chest. A strong odor of marihauna emanated from the car's interior. Upon questioning the three men, O'Keefe received evasive replies. O'Keefe asked each man if the box belonged to him. Each one denied ownership. The defendant additionally told O'Keefe that "he knew nothing about the box," that he could not "speak for the other people," and that he was "just going to Boston." O'Keefe mused aloud that "the box was just seen coming out of 23 Eaton Street, being carried by Mr. Flynn and Mr. Modica and . . . now nobody knows anything about the box." O'Keefe then asked Flynn, the driver of the car, if the motor vehicle belonged to him. When Flynn said it did, O'Keefe continued, "You're the operator of the car, it's your car. I would like to look in that box." Flynn replied in the affirmative. Flynn looked over at the defendant. No words were exchanged. When the box was placed on the trunk of the car, a police officer noticed that the box was marked "Fragile." The officers opened the box and found inside a computer and accessories, which were immediately identified by their serial numbers as property stolen from Rockport High School on December 19, 1983. All three men were placed under arrest and advised of their rights.

At this point the defendant said to Flynn: "As an attorney, I advise you to say nothing to the police." Flynn handed Inspector O'Keefe the keys to the car and asked O'Keefe to "lock it up." As O'Keefe secured the vehicle, he noticed a glassine bag, which appeared to contain marihuana, protruding from the briefcase the defendant had left on the rear seat of the car. The bag was also seized.[1]

1. *Motion to suppress.* The stop of the automobile was clearly justified because the police had "specific and articulable facts" to warrant suspicion that the three men in the vehicle may have been transporting stolen property. See *Terry* v. *Ohio,* 392 U.S. 1, 21 (1968); *Commonwealth* v. *Ferrara,* 376 Mass. 502, 504 (1978). The telephone tip (which had indicia of coming from a person with inside knowledge of the breaks)[2] had been "fortified through corroboration of its elements by means of police investigation." *Commonwealth* v. *Kaufman,* 381 Mass. 301, 303 (1980). At the time of the stop the police had seen a box capable of holding a computer being moved by three men from a house which had been identified as a possible place where stolen computer equipment had been secreted. One of the men was injured. This significant fact tended to corroborate evidence found at the scene of the Rockport High School break-in which indicated that someone involved in that crime might have been injured. The car, headed out of town, fit the characteristics of the type of vehicle used in the Rockport break. Movement of the box from the house to the car involved highly suspicious circumstances (furtive glances, apparently designed to see if anyone was observing, movement of a bulky object at night and in slippery conditions without extra lighting). These circumstances were indicative of efforts to avoid detection.

---

[1] The defendant was subsequently charged with possession of marihuana as a result of that seizure. He entered a guilty plea to the charge, and his conviction of that offense is not involved in this appeal.

[2] The tip specifically identified the addresses where the Modicas lived and implied personal knowledge that stolen goods might soon be moved from one of the addresses.

A valid *Terry* stop permits limited restraint of the individuals involved as long as their detention is commensurate with the purpose of the stop. *Florida* v. *Royer*, 460 U.S. 491, 500 (1983). "*Terry* and *Royer* state a 'principle of proportionality,' " *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985), that is, "[t]he degree of intrusiveness on a citizen's personal security, including considerations of time, space, and force, must be proportional to the degree of suspicion that prompted the intrusion." *Commonwealth* v. *Borges*, 395 Mass. at 794.

The detention and inquiry here did not exceed reasonable bounds, as measured by the information known and the purpose of the stop. Only one uniformed officer initiated the stop. That officer obtained the usual identification papers. A slight delay followed while the officer in charge of the investigation arrived. Some questioning with respect to the contents of the box was obviously in order as the purpose of the stop was to investigate the possible transportation of specific stolen property. The questioning was preceded by Inspector O'Keefe's identification of Dulong, observation of Dulong's injury,[3] and observation of the car as one having characteristics of the type of vehicle used in the crime. The inquiry, which was reasonably brief, produced inconsistent and incredible answers about ownership of the box. Up to that point in the stop, Inspector O'Keefe was still involved in a reasonable *Terry*-type inquiry. However, at that point, because of his prior knowledge of the crime and evasive answers, Inspector O'Keefe acquired probable cause to arrest the three men and to seize the box. See *Commonwealth* v. *Riggins*, 366 Mass. 81, 88 (1974) ("Implausible answers to police questions will, with other facts, support a finding of probable cause . . . as will peculiar behavior and evasive replies"). See also *Commonwealth* v. *Corridori*, 11 Mass. App. Ct. 469, 478 (1981); *Commonwealth* v. *Ceria*, 13 Mass. App. Ct. 230, 234 (1982). As a consequence, everything that occurred there-

---

[3] The fact that there was some evidence that Dulong did not receive his injury in the break is not of great relevance. That evidence was not known to the police. In considering the reasonableness of the police action, we consider only what was known at the time of the stop. See *Commonwealth* v. *Thibeau*, 384 Mass. 762, 764 (1981).

after becomes academic: probable cause existed to justify the defendant's further restraint.

The motion judge also concluded that Flynn consented to the opening of the box and examination of its contents. She found as follows: "[T]here is simply no evidence that the police in any way threatened or coerced Flynn. Nor were the circumstances of the stop so inherently coercive that they vitiated Flynn's consent. Instead, I find that Flynn suspected that the police knew something was amiss, but, not knowing how much the police knew, he attempted to feign innocence and hoped in that way to defend against the charges." The judge's observations are to be evaluated in light of the fact that the defendant, a lawyer, was present to give Flynn advice and had warned Flynn earlier that he (the defendant) would speak for him and that Flynn "shouldn't consent to a search of the vehicle." We think that the judge's finding that Flynn had given his valid consent to the opening of the box, in the apparent hope that he could bluff his way out of his predicament, is a tenable conclusion. See *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 177 (1980). It is therefore unnecessary to consider the possibly more difficult question whether the police could have opened the box and examined its contents without first seeking a warrant. See the discussion of the scope of searches of closed containers found in automobiles appearing in 3 LaFave, Search and Seizure § 7.2 (2d ed. 1987) and Smith, Criminal Practice and Procedure § 269 (2d ed. 1983).[4]

---

[4] What has been said disposes of the defendant's general argument that the episode involved an arrest without the existence of antecedent probable cause. The other considerations which the defendant points to as establishing an arrest (rather than a valid *Terry* inquiry that evolved into probable cause for an arrest) do not persuade us to his point of view. (a) The presence of extra police came about as the result of coordination between surveillance personnel watching two houses. (b) The closing in of the car, while a fact to be considered, is not necessarily "incompatible with a *Terry* inquiry or equivalent to an arrest." *Commonwealth* v. *Blake*, 23 Mass. App. Ct. 456, 461 (1987), and cases cited. (c) Flynn and the defendant were asked to step out of the car only after probable cause for their arrest existed. (d) Testimony by Inspector O'Keefe to the effect that Flynn was not free to leave represented O'Keefe's intention to complete a preliminary inquiry of the person who appeared to control the box before allowing that person to go. The testimony

2. *Alleged errors at the trial.* The defendant's claims of error as to certain matters at trial and the effectiveness of his trial counsel's representation do not present issues of great substance.

(a) The defendant maintains that testimony by two prosecution witnesses that other items of stolen property had been discovered in the apartment occupied by the defendant's father at 23 Eaton Street prejudiced him by unfairly accusing him of participation in other crimes. See *Commonwealth* v. *Tobin*, 392 Mass. 604, 615-616 (1984). "Evidence of other crimes is clearly not admissible for the purpose of proving bad character or a propensity to commit crimes. If, however, such evidence is relevant for some other purpose, it is not rendered inadmissible merely because it indicates the possible commission of another offense." *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269 (1982) (citations omitted). The testimony was introduced for the limited purpose of showing that the defendant knew that the box taken from his father's apartment and seized in the stop of the car contained stolen computer equipment. Thus, the evidence had relevance to the issue of the defendant's knowledge, which was the central issue at trial. There was an adequate foundation for the trial judge to make a preliminary finding that admission of the evidence could warrant a jury inference that the defendant was aware of the stolen computer equipment in his father's apartment. The admission of the evidence met the criteria established by cases such as *Commonwealth* v. *Murphy*, 282 Mass. 593, 598 (1933), and *Common-*

---

is not inconsistent with the intrusion permitted by the circumstances of the stop. (e) That the motion judge chose to accept Inspector O'Keefe's version of the events on key matters, including the time of giving Miranda warnings, reflects her considered choice as the factfinder, probably on an assessment that the other officers who testified had not been directly involved in the inquiry after the stop. (f) The present case distinctly contrasts with the principal cases relied upon by the defendant, such as *Commonwealth* v. *Bacon*, 381 Mass. 642 (1980), in which an unsubstantiated hunch was held insufficient to satisfy the standard necessary for a *Terry* stop, and cases such as *Commonwealth* v. *Loughlin*, 385 Mass. 60 (1982), and *Commonwealth* v. *Sanderson*, 398 Mass. 761 (1986), in which proper stops calling for very limited inquiries were turned into unlawful arrests by reason of lengthy and intrusive detentions.

*wealth* v. *Baker*, 368 Mass. 58, 85-86 (1975). After considering the evidence, "[w]e cannot say that the trial judge abused his discretion in concluding that [the] testimony . . . was more probative than prejudical." *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695 (1979).

(b) We discern nothing improper in the prosecutor's final argument. The prosecutor's remarks about what transpired at the questioning during the stop of the car were permissible comment on the evasive and inconsistent answers given by the three men and the inherent weakness of the defendant's case. See *Commonwealth* v. *Belton*, 352 Mass. 263, 270, cert. denied, 389 U.S. 872 (1967); *Commonwealth* v. *Porter*, 15 Mass. App. Ct. 331, 335-336 (1983). The prosecutor also argues as follows: "[I]t could have all ended right then and there. There could have been an adequate explanation. There could have been more information provided. But it wasn't." These comments were not an attempt to subvert the defendant's right to remain silent. Read in context, the "then and there" referred to the initial inquiry prior to the arrest, and the "adequate explanation" pertained to the inherent weakness of the answers given to the police.

Nor do we view the vague remark by the prosecutor on one aspect of the defendant's trial testimony as implying that the defendant had other witnesses he was afraid to call. The remark stayed within the bounds of the evidence produced at the trial and suggested (properly) that the defendant's testimony may have been fabricated.[5]

(c) "The question of effectiveness of counsel is a practical, not a theoretical one." *Commonwealth* v. *Schlieff*, 5 Mass. App. Ct. 665, 668 (1977). The record shows that the defendant was furnished with competent representation throughout the trial. His trial counsel's stipulation that the computer equipment

---

[5] There was no instruction by the judge concerning the drawing of inferences from the fact that certain witnesses had not been called. Compare *Commonwealth* v. *Franklin*, 366 Mass. 284, 294 (1974). Instead, the judge instructed the jury: "Keep in mind, again, as we have said from the outset and sometimes we repeat to the point of boring you, the evidence in this case is [what] you heard on the stand."

Commonwealth *v.* Modica.

found in Flynn's car (and other computer equipment and type-writers found in the defendant's father's apartment) were in fact stolen represented a tactical decision designed to focus the trial on the single issue disputed by the defense — whether the defendant knew that the computer equipment taken from Flynn's car had been stolen. The fact that the police had learned after the trial that one typewriter found in the apartment might not have been stolen does not make trial counsel's decision to enter into the stipulation unreasonable. The defendant has failed to establish either prong of the test for establishing ineffective-ness of trial counsel. See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

*Judgment affirmed.*

*Order denying motion for new trial affirmed.*