Commonwealth *v.* Bartlett.

COMMONWEALTH *vs.* WILLIAM BARTLETT.

No. 95-P-698.

Middlesex. September 9, 1996. - October 9, 1996.

Present: BROWN, KASS, & LAURENCE, JJ.

*Search and Seizure,* Threshold police inquiry. *Controlled Substances. Constitutional Law,* Search and seizure.

A State police officer's stop of a motor vehicle for speeding was proper, but where the driver produced a valid license and registration there was no reasonable basis for the officer to have made further inquiry in the circumstances or to have ordered the front passenger out of the vehicle: the defendant's motion to suppress cocaine found when the passenger stepped out of the car should have been allowed. [470-472] BROWN, J., concurring.

INDICTMENT found and returned in the Superior Court Department on August 6, 1992.

A pretrial motion to suppress evidence was heard by *Stephen E. Neel*, J., and the case was tried before *Howard J. Whitehead*, J.

*Robert M. Greenspan* for the defendant.

*Geraldine C. Griffin*, Assistant District Attorney, for the Commonwealth.

KASS, J. Following a routine stop of a motor vehicle for speeding, a State trooper embarked upon an interrogation of the occupants that led to an arrest of the defendant and, ultimately, his conviction of trafficking in more than fourteen grams of cocaine. G. L. c. 94C, § 32E(*b*)(1). A motion to suppress as evidence cocaine seized by the trooper was denied by a Superior Court judge. We conclude that the officer proceeded on a hunch, rather than reasonable suspicion, and that, therefore, the drugs seized should have been suppressed.

We take our facts largely from careful findings made by the motion judge, with some supplementation from the transcript

of the hearing on the suppression motion. At approximately 10 A.M. on April 28, 1992, State Trooper Eugene O'Neill, while on routine patrol on the Lowell Connector in Lowell, stopped a car, driven by Felix Luna of Cambridge, for travelling 65 to 70 miles per hour in a 55-mile per hour zone. When Trooper O'Neill signalled Luna's car to pull over, Luna did so without hesitation and stopped in the breakdown lane. O'Neill asked for license and registration and received Luna's operator's license and a car rental agreement in the name of Evelyn Gonzales. The documentation was facially in order and O'Neill did not at that point question Luna about who Gonzales was nor did he call his headquarters to check the validity of the documents.

O'Neill then asked Luna if he knew how fast he had been going. Luna answered, "No." The trooper's next question was where Luna was coming from and where he was going. Luna responded that he was coming from Boston and was headed to Lowell to pick up a carpenter for a construction job back in Boston. As he continued to talk with Luna, O'Neill noticed that Bartlett, who was in the front passenger seat and Luna, each wore electronic pagers (beepers), and O'Neill was struck that there were no construction tools in the passenger compartment. None of the occupants made any quick or unusual movements (e.g., reaching under a seat) that might have been regarded as furtive or suggestive of a purpose to conceal. Luna's demeanor, according to O'Neill, was consistently cooperative, calm, and responsive to his questions.

Trooper O'Neill's suspicion, nevertheless, became aroused on the basis of the following:

> (1) the car was rented and he knew drug couriers used rented cars;
>
> (2) the car had been rented at Logan Airport and he knew Logan was a point of entry for drugs (in point of fact it turned out that the car had not been rented at Logan Airport, but at the Park Plaza Hotel in Boston);
>
> (3) the car was not rented to Luna or, presumptively, either of the two passengers riding with him;
>
> (4) Luna's operator's license showed him to be a resi-

dent of Cambridge and it was odd that he should rent a car for a local trip;

(5) it seemed unlikely that Luna would be driving from Boston to Lowell and back to pick up a carpenter;

(6) there were no construction tools or materials in the passenger compartment of the car;

(7) Luna and Bartlett wore beepers and he associated beepers with drug dealers;

(8) he was aware that there had been drug seizures on the Lowell Connector and, indeed, had himself made arrests on the Lowell Connector related to drug traffic.

On the basis of the suspicion he had formed, O'Neill ordered Luna out of the car and pressed his inquiries. Luna knew neither the last name nor the address of the carpenter he was picking up in Lowell but knew how to get to his house. The Evelyn Gonzales who had rented the car, Luna explained, was his common-law wife. Luna's clothes struck O'Neill as uncharacteristically clean and the time of day puzzlingly late for someone involved with construction work. The trooper sensed something amiss and he asked Luna whether there were drugs in the car. "No," Luna told O'Neill, "You can look." So O'Neill did, but not without also ordering Bartlett out of the car. As Bartlett stepped out, O'Neill spotted what he was after, a small taped package that turned out to contain white powder in a small jar. The arrest of Luna and Bartlett followed.

There is no question about the legitimacy of Trooper O'Neill's stop of Luna and his companions; they were speeding. See *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 314 (1992); *Commonwealth* v. *Lantigua*, 38 Mass. App. Ct. 526, 527-528 (1995). The nature of the stop, i.e., for a traffic offense, defines the scope of the initial inquiry by a police officer. See and compare *Commonwealth* v. *Modica*, 24 Mass. App. Ct. 334, 339 (1987) (purpose of stop, based on information, was to investigate transportation of stolen computers). It should pertain to operation of the motor vehicle: inquiry into the status of the driver as a licensed operator and the registration of the automobile. Put more simply, the officer, as did

Trooper O'Neill, asks the driver for license and registration. If the driver produces a valid license and registration, there is ordinarily no reason for an officer to probe further. The officer should give the driver a citation for the traffic offense and then permit the vehicle to proceed on its way. *Commonwealth* v. *McCleery,* 345 Mass. 151, 153 (1962). *Commonwealth* v. *Ferrara,* 376 Mass. 502, 505 (1978). *Commonwealth* v. *Loughlin,* 385 Mass. 60, 62 (1982). *Commonwealth* v. *Kimball,* 37 Mass. App. Ct. 604, 607 (1994). *Commonwealth* v. *Torres,* 40 Mass. App. Ct. 6, 8-9, 11 (1996).

Those cases do not require that an officer making a stop for a traffic violation ignore what he sees, smells or hears. The sight of a half empty bottle of gin, of a firearm, or of a furtive movement, the smell of liquor, or the sound of slurred speech, of course, invites further inquiry. None of the factors recited by O'Neill approach that sort of reasonable stimulus for investigation.

(1) The car was rented and O'Neill knew drug couriers use rented cars, but that knowledge does not support a syllogism that all rented cars are used for drug runs. (2) While it may be that Logan Airport is a point of entry for drugs, obviously every car registered to a Logan car rental office is not a vehicle for narcotics shipment. The unreasonable leap of logic is dramatized in this instance by the fact made known by the government (to its credit) that the trooper's assumption that the car had been hired at Logan proved ultimately to be false, a fact he might have realized had he really been interested in the circumstances of the car rental. (3) The car was not rented to any of the persons in the car. After being asked to step out of the car, and asked a second time about where he was coming from and where he was going, Luna explained his connection to Evelyn Gonzales. If the trooper thought the use of the car unauthorized, the obvious investigatory step would be the routine one of checking to see if the car had been reported stolen. O'Neill did not do this; rather he stuck the car rental agreement into his pocket while he questioned Luna about other matters. (4) Luna lived in Cambridge and O'Neill thought it odd that Luna would be renting a car for a local trip, but there are any number of reasons (e.g., the family car is in the repair shop or another member of the family needs it) that a person rents a car for local use. (5) Luna and Bart-

lett wore beepers. To be sure, drug dealers use beepers but so do vast numbers of people, including repairmen and, perhaps, construction workers. Contrast *Commonwealth* v. *Clermy,* 421 Mass. 325, 330 (1995); *Commonwealth* v. *Williams,* 422 Mass. 111, 119 (1996); *Commonwealth* v. *Sanchez,* 40 Mass. App. Ct. 411, 417 (1996); and *Commonwealth* v. *Pena,* 40 Mass. App. Ct. 905, 906 (1996), in which beepers were acknowledged as accoutrements of drug trade but in far more suggestive circumstances. (6) There had been drug seizures effected on the Lowell Connector but the same could undoubtedly be said for other major traffic arteries in Massachusetts. Factors (7) and (8), that it struck O'Neill as unlikely that Luna would be driving from Boston to Lowell to pick up a carpenter and bring him back to Boston and that there were no tools in the passenger compartment, suffer from two deficiencies: first, they are hardly so unlikely as to suggest guilt or concealment (the carpenter could as likely be bringing his tools or tools might have been in the trunk) and; second, those observations were based on investigatory conversation for which the officer had no lawful basis once he had received a valid license and registration (which he could have verified).

While alert police officers may add up suggestive factors, each of which is insufficient alone to support a search or arrest, *Commonwealth* v. *Rivera,* 33 Mass. App. Ct. at 314-315, the factors we have enumerated are singular for not, when fairly viewed, being suggestive. Compare *Commonwealth* v. *Bacon,* 381 Mass. 642, 645 (1980). Contrast *Commonwealth* v. *Rivera, supra* at 314-315. Adding up eight innocuous observations — eight zeros — does not produce a sum of suspicion that justifies a line of interrogation, an order of persons out of their car, and a search of their car. It is apparent that Trooper O'Neill played a good hunch and fished until he caught something. The vice in interrogations and searches based on a hunch is their essentially random and arbitrary nature, a quality inconsistent, under constitutional norms (art. 14 of the Declaration of Rights of the Massachusetts Constitution and the Fourth Amendment to the Constitution of the United States), with a free and ordered society. See the concurring opinion of Chief Justice Hennessey in *Commonwealth* v. *Loughlin,* 385 Mass. at 64-66. See also *Commonwealth* v. *Kimball,* 37 Mass. App. Ct. at 607-608.

The order denying the motion to suppress as evidence the drugs removed by Trooper O'Neill from the car driven by Luna is reversed and the judgment of conviction, based on that evidence, is reversed.

*Judgment reversed.*

*Verdict set aside.*

BROWN, J. (concurring). This record speaks very loudly that this driver was interrogated on suspicion of being Hispanic. Only the driver's ethnicity and possession of a beeper were apparent at the time of the stop. Previously, this court has stated that ethnicity plus velocity does not equal probable cause. See *Commonwealth* v. *Bodden*, 11 Mass. App. Ct. 964 (1981). It is now clear that we need to insert another equation of inequality into our jurisprudence: ethnicity plus a beeper does not equal probable cause.

Before it is said that another criminal has evaded punishment on a technicality, let me say that judges do not view compliance with the Constitution as a mere mundane inconvenience. Cf. *Brown* v. *Board of Educ.*, 347 U.S. 483 (1954); *Baker* v. *Carr*, 369 U.S. 186 (1962); *Gideon* v. *Wainwright*, 372 U.S. 335 (1963). In further response to those who say judges allow too many guilty persons to go free, I pose this question: how many Hispanic persons have been stopped and their person or vehicles searched without probable cause and with no contraband discovered? It is the constitutional protections and guarantees extended to those persons that courts are zealously trying to protect.