McCann, J.
INTRODUCTION
The Commonwealth is represented by Assistant District Attorney Timothy M. Farrell, Worcester County District Attorney’s Office, 2 Main Street, Courthouse, Worcester, Massachusetts 01608. The defendant, Jose A. Nunez, is represented by John M. Dombrowski, Dombrowski & Aveni, 6 Grove Avenue, Leominster, Massachusetts 01453.
BACKGROUND
The defendant is charged with one count of trafficking in cocaine. He filed a Motion to Suppress.[1] The motion requests suppression of evidence under the Fourth Amendment of the United States Constitution, Article Fourteen of the Massachusetts Declaration of Rights, G.L.c. 276 and Mass.R.Crim.P. 13; and further suppression of any statements that are “fruit of the poisonous tree.”
FINDINGS AND RULINGS
The Court makes the following findings of fact beyond a reasonable doubt and the following rulings of law. Trooper Brendan Shugrue of the Massachusetts State Police has been a trooper for nine years. On November 11, 2001, he was on the 3 p.m. to 11 p.m. shift. At 11:20 p.m. he was in a stationary position in Auburn on Interstate 290. He observed a passenger transport van approach him and then go by him east bound. He observed the rear license plate light was out *537 and the number plate could not be seen. He pulled out and activated his lights and eventually the van stopped. He approached the van from the passenger side. The van was full of people, five to ten, occupying all of the seats of the van.
Shugrue knocked on the front passenger side window. A female was seated there. She rolled down her window. Shugrue asked the operator for his license and registration. The operator provided his license and registration which were in order.
Shugrue scanned his flashlight through the van. He observed the defendant, Jose A. Nunez, who was seated on the bench seat behind the front seat. Nunez was on the passenger side of that bench seat. Nunez was not wearing a seat belt. Shugrue observed that Nunez kept looking down at his feet and at a duffel bag which was partially under the seat where he was seated.
Shugrue opened a side door of the van. He asked Nunez his name. He stated his name was Jose Rodriguez Nunez. He asked for identification. Nunez produced what appeared to be a New York State Identification Card. It was not from the New York Registry of Motor Vehicles. Shugrue opined that it appeared to be homemade. Shugrue is experienced with New York Identification Cards and in his opinion the card produced by Nunez was not an official New York Card. The card had a picture of Nunez. The card was in the name of Jose Nunez Rodriguez or Jose N. Rodriguez.
The defendant kept looking at the bag and appeared to Shugrue to be pushing the bag further under the seat. Nunez’s hands were trembling and he appeared to be extremely nervous to Shugrue. During the period of less than one minute that Shugrue questioned Nunez, Nunez would often look past the officer and break eye contact. Shugrue opined that in the experience of all of his roadside stops Nunez appeared excessively nervous.
Shugrue asked Nunez if the bag he was pushing under the seat was his. Nunez said “no.” Shugrue ordered Nunez out of the vehicle because he wanted to pat frisk him. Nunez stepped out of the passenger side of the van. He was pat frisked by Shugrue. The pat frisk revealed nothing. At that time, another trooper, William Pinkes, pulled up to assist Shugrue.
Pinkes is a State Trooper with ten years experience. He was on the same 3 to 11 shift. He happened to be traveling east on Route 290 when he came upon Shugrue. He saw Shugrue having an interaction with Nunez and stopped to assist.
Shugrue continued to question Nunez. He asked Nunez if he was an illegal alien. Nunez responded that he did not speak English. He appeared nervous to Shugrue. Shugrue told him to sit down on the adjacent curbing. Pinkes went to the van. Shugrue stood watch over Nunez.
Pinkes went to the side door of the van. He observed the duffle bag under the seat. A black female was seated next to where the defendant had been seated. Pinkes asked her if the duffle bag was hers. The female responded “no” and pointed to Nunez who was outside of the van. Pinkes then took the duffle bag from under the seat and held it up and asked each of the occupants if the bag was theirs. All responded “no.” Pinkes then brought the duffle bag to the defendant. The defendant was seated on the curbing. As Pinkes approached him with the bag, Nunez began to rock, became evasive and appeared extremely nervous. Pikes asked Nunez if the bag was his. Nunez replied “no.” At that point, Shugrue placed Nunez in the rear of his cruiser.
Pinkes then opened the bag. It was a duffle bag. Inside of it was a black plastic bag. He opened it. Inside of that plastic bag was a smaller plastic bag. Pinkes opined that he recognized the packaging to be similar to narcotics being packaged. He opened it. Inside of that bag was a foil ball. He unwrapped the foil. Underneath the foil was a wrapping of paper towels with an object inside. The paper towels were wrapped with rubber bands. Pinkes took the rubber bands off and inside the paper was a clear bag with what appeared to Pikes to be cocaine that measured in a field test 122 grams.
Nunez was placed under arrest. He was brought to the barracks by Shugrue. Pinkes joined him there. Both completed the booking process.
Nunez was given his Miranda rights by Pinkes. They were given in English. Shugrue gave the rights written in Spanish to Nunez. Nunez signed the form. There were no other officers or persons at the barracks who spoke Spanish.
Pinkes questioned Nunez. He held up the duffle bag and asked the defendant if it was his. He said “yes.” He then pulled out a sweatshirt and asked if it was his. He said “yes.” He pulled out another sweatshirt and asked if it was his. Nunez said “yes.” Nunez was asked where he bought the cocaine. He said he paid $3,000 for it. He was then asked how much he would sell it for. He said $3,500.
DISCUSSION
This Court finds that when Shugrue asked Nunez if he was an illegal alien, Nunez responded that he could not speak English and appeared nervous to Shugrue and Shugrue told him to sit down on the adjacent curbing that Nunez at that point was not free to leave. This Court determines that at that point he was under arrest.
Although Trooper Brendan Shugrue and Trooper William Pinkes are both Massachusetts State Troopers, no evidence was presented to this Court that *538 either of them had any training in drug detection or drug arrests or the recognition of drugs.
The Commonwealth cites Massachusetts G.L.c. 90, §13A, the so-called seatbelt statute. The facts before the Court clearly show that the van in which the defendant was seated pulled over and stopped after Shugrue pulled out and activated his overhead lights. Shugrue then exited his cruiser. He approached the van and knocked on the front passenger window. He then had a discussion with the operator and obtained his license and registration which appeared to be valid. It was not until after that that Shugrue flashed his flashlight into the rear seat. The van had been stopped sufficiently long enough for the trooper to exit his car and approach the van and have a dialogue with the operator. Although it is not known how long all of this took, it obviously involved some period of time. The statute cited by the Commonwealth requires a person to have a seatbelt on while a vehicle is being operated. The defendant could very well have removed his seat belt when the van stopped. There is insufficient evidence to see any applicability of the seatbelt statute to this case.
There is evidence before this Court that Pinkes pulled up to assist Shugrue when Pinkes observed the stop as he was driving by. Shugrue never called for assistance. He did not summons Pinkes or any other backup. Furthermore, the evidence is totally devoid of Shugrue having any fear or concern for his safety.
In regard to Miranda rights, Nunez stated that he did not speak English. Shugrue gave rights to Nunez which were a preprinted form in Spanish. Although Nunez signed the form, he was never asked. There is no evidence before the Court as to whether he asked Nunez if he read it, if he understood the form and if he was signing it freely or voluntarily. There is no credible evidence before this Court that Nunez was properly given his rights, that he understood his rights, or that he voluntarily waived his rights. Nunez then gave incriminating statements to the police.
RULINGS OF LAW
I. The Scope of the Stop
“Where the police have observed a traffic violation, they are warranted in stopping a vehicle.” Commonwealth v. Santana, 420 Mass. 205, 207 (1995), quoting Commonwealth v. Bacon, 381 Mass. 642, 644 (1980); see Commonwealth v. Thompson, 427 Mass. 729, 732 (1998); Commonwealth v. Johnson, 413 Mass. 598, 600 (1992); Commonwealth v. Ciaramitaro, 51 Mass.App.Ct. 638, 642-43 (2001); Commonwealth v. Bartlett, 41 Mass.App.Ct. 468, 470 (1996). Here, Trooper Shugrue observed that the rear license plate light was out and the number plate could not be seen. This violation rendered Trooper Shugrue’s stop of the vehicle in which the defendant was a passenger proper. See id.
Once the stop is determined to be proper, based on reasonable suspicion, the scope of the police officer’s inquiry must be analyzed. See Ciaramitaro, 51 Mass.App.Ct. at 643. The nature of the stop defines the scope of the inquiry by the police officer. Ciaramitaro, 51 Mass.App.Ct. at 643; Bartlett, 41 Mass.App.Ct. at 470. The inquiry “should pertain to the operation of the motor vehicle . . . [meaning the police officer] asks the driver for license and registration. If the driver produces a valid license and registration, there is ordinarily no reason for an officer to probe further. The officer should give the driver a citation . . . and then permit the vehicle to proceed on its way.” Bartlett, 41 Mass.App.Ct. at 470-71; see Ciaramitaro, 51 Mass.App.Ct. at 643-44; Commonwealth v. Kimball, 37 Mass.App.Ct. 604, 607 (1994). The police officer, however, should not “ignore what he sees, smells or hears” in determining whether to exceed the scope of the stop. Bartlett, 41 Mass.App.Ct. at 471. Often, “observations made, and events occurring, during the stop [ ] lead to heightened suspicion (justifying further inquiry), or to probable cause, or to plain-view seizures.” Ciaramitaro, 51 Mass.App.Ct. at 642.
If the stop is justified, “the officers could take reasonable precautions for their own protection includ[ing] ordering occupants out of a car for questioning . . . [and searching] the interior of an automobile [as long as the search is] confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered.” Commonwealth v. Ferrara, 376 Mass. 502, 505 (1978) (internal quotations omitted); see Kimball, 37 Mass.App.Ct. at 607. The police officer is warranted in exceeding the scope of the stop if he has a reasonable suspicion which, in turn, enables him to make a threshold inquiry. See Commonwealth v. Stampley, 437 Mass. 323, 325 (2002); Commonwealth v. Salerno, 356 Mass. 642, 646 (1970). Reasonable suspicion must be distinguished from an “essentially random and arbitrary” hunch. See Bartlett, 41 Mass.App.Ct. at 472. A hunch “is an insufficient basis for a threshold inquiry.” Kimball, 37 Mass.App.Ct. at 607.
Reasonable suspicion results when conduct by an individual “gives the officer reasonable ground to suspect that a person has committed, is committing, or is about to commit a crime.” Ferrara, 376 Mass. at 504 (internal quotations omitted). The defendant’s not wearing his seatbelt at the moment Trooper Shugrue saw him in the back of the van was not a violation of G.L. 90, §13A and therefore did not create a reasonable suspicion that the defendant had committed or was committing a crime. See id. It was therefore improper for Trooper Shugrue to prolong the stop of the van by asking the defendant for identification. Additionally, the fact that the defendant kept looking at his feet and appeared nervous did not provide a sufficient basis for Trooper Shugrue to suspect that *539 the defendant had committed, was committing, or was about to commit a crime. See id.
In Ferrara, the troopers stopped the car the defendant was driving because they had seen it in front of a cleaning establishment they had had under surveillance. Id. at 503. The court found that these facts did not create a reasonable suspicion, and “[o]nce the driver had produced a valid license and registration, there was no basis for further interrogation and no need for further protective precautions.” Ferrara, 376 Mass at 505; see Commonwealth v. Loughlin, 385 Mass. 60, 62 (1982). Nevertheless, the troopers “ordered the passengers out of the car, saw a handgun in the back seat, and took possession of it.” Ferrara, 376 Mass. at 503. The subsequent frisks of the passengers and a search of the car produced two additional guns, both of which were suppressed as fruits of the gun illegally seized from the back seat. Id. at 503-04, 505.
In this case, Trooper Shugrue’s suspicion of the defendant was based on behavior that was less suggestive of being of a criminal nature than the situation before the troopers in Ferrara. See id. at 503. Thus, Trooper Shugrue proceeded on a mere hunch, improperly exceeding the scope of his initial stop of the driver of the van. See Ferrara, 376 Mass. at 504; Bartlett, 41 Mass.App.Ct. at 472 (concluding extension of search not justified by trooper’s “eight innocuous observations[,]” including such facts as name on rental agreement was not driver’s and no tools in car despite driver’s being carpenter); Kimball, 37 Mass.App.Ct. at 606, 607 (holding scope of stop impermissibly exceeded where there was no visible violation of law and only other basis was that car occupants “looked straight ahead rather than making eye contact” with trooper). Accordingly, the drugs seized upon this illegal extension of the stop must be suppressed, and the statements the defendant made at the barracks after his arrest are also suppressed as fruits of the poisonous tree.
II. Ordering the Defendant Out of the Van
Where, as here, a police officer is justified in stopping a motor vehicle, “for their safety and the safety of the public, [he may] order the occupants to exit the automobile.” Santana, 420 Mass. at 212; see Stampley, 437 Mass. at 325; Commonwealth v. Gonsalves, 429 Mass. 658, 661 (1999). Such an exit order is proper when “a reasonably prudent man in the policeman’s position would be warranted in the belief that the safety of the police or that of other persons was in danger.” Santana, 420 Mass. at 213 (internal quotations omitted); see Stampley, 437 Mass. at 325; Commonwealth v. Torres, 433 Mass. 669, 673 (2001); Gonsalves, 429 Mass. at 661; Loughlin, 385 Mass. at 62. To establish the existence of this reasonable belief, “the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car.” Stampley, 437 Mass. at 326, citing Gonsalves, 429 Mass. at 665.
In Stampley, the trooper pulled over a car in which the defendant was a passenger because of a vehicle equipment infraction. 437 Mass. at 324, 326. Before he approached the car, all three occupants rolled down their windows and extended their hands outside, in response to which the trooper radioed for backup. Id. Shortly thereafter, the backup trooper observed the defendant pull his arms back inside the car, “bend forward, and move his arms around ‘doing something underneath the front seat.’ ” Id. at 324-25. The trooper was concerned that the defendant “was either ‘hiding something’ or ‘getting something’ and decided to remove the defendant from the vehicle." Id. at 325. A pat frisk uncovered marijuana; a subsequent search of the passenger seat where the defendant had been sitting revealed a handgun. Id. The court noted that “[numerous cases have recognized that such gestures, suggestive of the occupant’s retrieving or concealing an object, raise legitimate safely concerns to an officer conducting a traffic stop” and concluded that the trooper was justified in ordering the defendant to exit the car. Id. at 327 (citations omitted).
Conversely, in this case, the defendant merely kicked at the bag under his seat. “The justification for an exit order does not depend on the presence of an ‘immediate threat’ at the precise moment of the order, but rather on the safely concerns raised by the entire circumstances of the encounter.” Id., at 328. In this case, Trooper Shugrue did not fear for his safety or the safety of the public; he did not call for back up, or indicate his concern in any other way. The totality of these circumstances did not justify Trooper Shugrue’s order that the defendant exit the car. See id. The illegality of the exit order thereby rendered the subsequent pat frisk, search of the duffle bag, and statements by the defendant improper as well. Accordingly, the drugs found in the duffle bag and the defendant’s statements must be suppressed.
ORDER
For those reasons discussed above, the motion of the defendant to suppress any and all evidence seized in the search of his duffle bag on November 11, 2001, and any and all statements made as a result of the search, is allowed.

The Motion to Suppress was filed by Eric R. Taintano, 65 Merrimack Street, Suite 2, Lawrence, Massachusetts 01841. He withdrew his appearance on August 29, 2002 and John M. Dombrowski was appointed counsel on that same date.