Dortch-Okaka, J.
The defendants are under indictment for possession of a firearm without a license, two counts, and receiving a firearm with a defaced serial number. In addition, defendant Peraltáis charged with operating a motor vehicle after suspension. They now move, pursuant to Mass.R.Crim.P. 13, to suppress all evidence whether tangible or intangible and all statements[1] made as a result of the warrantless stop and search of their persons and the car in which they traveled. As grounds therefor, the defendants assert that the evidence was seized in violation of the Fourth and Fourteenth Amendments of the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights and G.L.c. 276 et seq. For the reasons discussed below, the defendants’ motions to suppress are ALLOWED.
FINDINGS OF FACT
On June 1, 2003, at approximately 1:30 p.m., Massachusetts State Trooper Lawrence Kiely was patrolling in the vicinity of Route 128 and Interstate 93 in Randolph when he received a radio transmission from Trooper Lombardi who was located in the vicinity on Route 24. Trooper Lombardi asked Kiely to investigate a Ford Taurus that had just passed Lombardi with strobe lights flashing at the rear of the vehicle. Lombardi wanted to know if the Taurus was a police vehicle as flashing strobe lights are used lawfully only by governmental entities.
The weather was rainy and overcast. Trooper Kiely spotted a vehicle proceeding in his direction matching the description given to him by Lombardi. Kiely observed that the headlights of the Taurus were alternating, so called “wig wag” headlights. Trooper Kiely understood that the use of wig wags was limited to governmental vehicles. When the Taurus passed him, Kiely merged behind it to get a closer look. He could not view the inside of the vehicle as the windows were, in his opinion, excessively tinted.
Trooper Kiely is an experienced officer with ten years service. He was aware that automobile glass cannot lawfully exceed 35% tint in order to permit light to pass through the glass. Kiely has tested many cars using a tint meter to determine if the amount of tint of a window is excessive. Because of this experience, he was able to determine without using a meter that the tinting of the Taurus windows was excessive.
While traveling behind the Taurus, Trooper Kiely performed a registry check on the vehicle to determine if the vehicle was owned by a municipality and if it was stolen. He learned that the Taurus was registered to Jose Rivera and had not been reported stolen. Trooper Kiely then decided to stop the vehicle for illegal display of lights and excessive tinting. After activating his blue lights, Trooper Kiely proceeded to stop the Taurus. The car was slow to respond, but did pull over about a mile south of Route 37 near Braintree.
When Trooper Kiely approached the driver’s side of the vehicle, he observed four occupants in the car. He spoke to the driver and asked for his license and registration. The driver, defendant Henry Peralta, produced a New York driver’s license and valid registration for the vehicle in the name of Jose Rivera. Peralta asked Trooper Kiely why they were stopped. Trooper Kiely explained, and at some point Peralta exited the vehicle to see what Trooper Kiely found wrong with the flashing lights. Peralta then returned to the vehicle. Trooper Kiely questioned Peralta further. Peralta said he lived in Boston. Trooper Kiely informed Peralta that he was required to have a Massachusetts license if he lived in Massachusetts.
Soon thereafter, Sgt. Littlefield arrived and approached the vehicle on the passenger’s side. Trooper Kiely, speaking from the driver’s side of the vehicle, asked if there was anything illegal in the car. Peralta responded that there was nothing in the car. Trooper Kiely asked if he could look into the vehicle and someone responded, “you can if you like.” The trunk of the car was then unlocked from the inside by one of the occupants and Sgt. Littlefield went to the back of the car and looked in the trunk. He called to Trooper Kiely and showed him a duffle bag with a supermarket bag inside it containing a large sum of money. Both bags were open and Trooper Kiely could see stacks of banded money, later determined to be approximately $123,000. Trooper Kiely called for assistance from other officers.
Trooper Kiely asked Peralta if the money was his and Peralta said no. The other occupants of the car also denied ownership of the money. Sgt. Littlefield took custody of the money and Trooper Kiely removed Peralta from the car and put him in his police cruiser. Trooper Kiely then ran a warrant check on Peralta which indicated that his Massachusetts driver’s license was suspended and he had an outstanding warrant. Peralta was then placed under arrest for the *650 outstanding warrant and given his Miranda rights by Trooper Kiely.
The three passengers were then ordered out of the car and frisked. When they returned to the car, they were questioned about the money and the owner of the car, Jose Rivera. Trooper Kiely attempted to locate Rivera through the dispatcher but was unsuccessful. At this point, the combination of rain and driver curiosity was causing a major traffic backup. Because defendant Juan Gomez had a valid driver’s license, he was asked to drive the car to the state police barracks. Trooper Kiely led in his cruiser and the Taurus followed, with Sgt. Littlefield at the rear. When they reached the Milton barracks, the occupants proceeded to arrange for rides and Peralta was booked.
Sgt. Littlefield inventoried the money and the motor vehicle. Because of the amount of money found he was suspicious of illegal drug activity. He requested the assistance of a K9 unit to determine if there was any drug residue on the money. After more than one hour, Trooper Kane and his dog Riggs arrived. The three passengers of the Taurus were still present outside at the time the K9 unit arrived. No one had contacted the police to claim the money or the motor vehicle by this time.
Trooper Charles Kane has been with the Massachusetts State Police for 16 years, eight years as a road Trooper. He has conducted hundreds of narcotics investigations for which he has received special training. In 2000 he transferred to the K9 unit and received a dog. After his training in K9 investigations, his dog, Riggs, became certified. Riggs is trained to perform narcotics investigations and tracking. He has worked on 75 to 100 cases and has found narcotics approximately 20 times. He is a “passive response” dog who sits when he finds the source of an odor.
Trooper Kane arrived at the barracks shortly after 3:00 p.m. and spoke with other officers. He then took Riggs to the second floor to look for the money taken from the Taurus. The money had been hidden there previously at Trooper Kane’s direction. He gave Riggs a “seek” command and the dog began to do a narcotics search. Riggs indicated that he had found the source of a narcotics odor by sitting at a location and barking; the same location where the money was hidden. As Trooper Kane went to put Riggs into his cruiser, he noticed that the passengers of the Taurus were just leaving.
At the completion of the money search, Trooper Kane was asked to have Riggs search the car. It was his practice to prepare to search a car by surveying the vehicle himself to make sure there were no sharp objects or protrusions that could injure the dog. When Trooper Kane entered the trunk of the car, he noticed that there was carpet padding glued to the body frame of the motor vehicle. Trooper Kane found this to be unusual and consistent with the existence of an after market compartment or “hide.” He moved the carpeting to expose the spare tire and noticed that the items in this area were loose. He then removed the tire and discovered a cutout of a trap door, a “hide.” Looking in, he saw what appeared to be a handgun. He was able to open the hide by using the trunk release button. Trooper Kane found ski masks, badges, firearms and handcuffs in this area of the motor vehicle. A search by Riggs indicated the presence of narcotics. After recovering these items, Trooper Kiely searched the area for the three passengers, but they could not be located. He later obtained arrest warrants for them from Quincy District Court.
DISCUSSION
The defendants argue that all evidence obtained by the police during the course of the above transactions was unlawfully seized in violation of the Fourth and Fourteenth Amendments of the United States Constitution, Articles 12 and 14 of the Massachusetts Declaration of Rights and G.L.c. 276, et seq.[2] Specifically, the defendants assert that both the money seized from the truck of the vehicle, as well as the various items found in the “hide,” were unlawfully obtained and should be suppressed.[3]
1. The $123,000
The defendants argue the discovery of the money in the Taurus’s trunk is traceable to Trooper Kiely’s illegal interrogation of the defendants during a routine traffic stop. Relying on Commonwealth v. Torres, 424 Mass. 153 (1997), and cases cited therein, the defendants claim that Trooper Kiely did not have sufficient reasonable suspicion, during a routine traffic stop, to interrogate them regarding any contraband located in the vehicle. This Court agrees.
There is no dispute that the initial stop of Peralta for suspected vehicular infractions was proper and supported by probable cause. There is also no question that Trooper Kiely’s requests to see Peralta’s license and registration in connection with the traffic stop were permissible. Commonwealth v. Torres, 424 Mass, at 157 (“original stop of the automobile for speeding, and the threshold inquiry of [driver] in connection with the violation, were valid”); Commonwealth v. Ellsworth, 41 Mass.App.Ct. 554, 556 (1996) (police officer’s request for license and registration from driver stopped after observing erratic behavior found to be permissible threshold inquiry).
The defendants argue, however, that once Trooper Kiely had obtained a valid driver’s license and registration from Peralta, there was no reasonable suspicion justifying any further investigation of either Peralta or the other passengers, and that their detention amounted to an unlawful seizure. “It is well settled that a police inquiry in a routine traffic stop must end on the production of a valid license and registration unless the police have grounds for inferring that either the operator or his passengers were involved in the commission of a crime ... or engaged in other suspicious conduct.” Commonwealth v. Torres, 424 Mass. *651 at 158, quoting Commonwealth v. Torres, 40 Mass.App.Ct. 6, 9 (1996). “The pertinent inquiry is whether the degree of intrusion is reasonable in the circumstance. The degree of intrusiveness ... is that which is ‘proportional to the degree of suspicion that prompted the intrusion.’ ” Commonwealth v. Moses, 408 Mass. 136, 141 (1990), quoting Commonwealth v. Borges, 395 Mass. 788, 794 (1985). An intrusion by a police officer, without reasonable suspicion grounded in specific articulable facts, becomes an unlawful seizure, “if in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.” Commonwealth v. Tones, 424 Mass, at 157-58, quoting Borges, 395 Mass, at 791.
While the degree of intrusiveness in the present case was relatively low, i.e., Trooper Kiely’s asking if there was anything illegal in the car and request to search the vehicle, this line of inquiry must be weighed against the suspicion that prompted the line of questioning. At the time Trooper Kiely posed this question, Peralta had produced a valid New York driver’s license and a registration with the name of another owner. He had also exited to car and examined the wig-wag lights with the Trooper. These facts, even when combined with the reasons for the initial traffic stop (the wig-wag lights and tinted windows), were insufficient to arouse any degree of reasonable suspicion that would have permitted further interrogation by the Trooper Kiely. See Commonwealth v. Torres, 424 Mass, at 159 (delay by driver in exiting vehicle and apparent nervousness of passenger insufficient to arouse reasonable suspicion or justify further interrogation); Commonwealth v. Ferrara, 376 Mass. 502, 505 (1978) (“Once the defendant had produced a valid license and registration, there was no basis for further interrogation and no need for further protective precautions"); Commonwealth v. Bartlett, 41 Mass.App.Ct. 468, 472 (1996) (eight innocuous observations made by police officer during routine traffic stop did not produce a sum of suspicion that justified further line of interrogation); cf. Commonwealth v. Davis, 41 Mass.App.Ct. 793, 796 (1996) (pat and frisk of driver of an automobile who had produced a valid license and registration in connection with a routine traffic stop held impermissible). Further, while “(a]n officer is entitled to take reasonable steps to ensure his safety,” Commonwealth v. Williams, 422 Mass. 111, 117 (1996), Peralta’s exit from the vehicle to look at the wig-wag lights eliminated any potential threat to the troopers’ safety. See Torres, 424 Mass, at 159; Ferrara, 376 Mass, at 505.
Trooper Kiely’s line of questioning changed the “character” of the routine traffic stop, making it clear to the defendants that they were “seized and would continue to be seized until some indeterminate future time.” Torres, 424 Mass. 153, 157-58.[4] Because Trooper Kiely did not have reasonable suspicion to embark on his line of questioning, the seizure of the defendants was unlawful. Although Trooper Kiely’s intuition — or hunch — that criminal activity was afoot may have been correct, seizures “based on a hunch [are] essentially random and arbitrary [in] nature, a quality inconsistent, under constitutional norms (art. 14 of the Declaration of Rights of the Massachusetts Constitution and the Fourth Amendment to the Constitution of the United States), with a free and ordered society.” Torres, 424 Mass, at 161.[5]
All evidence discovered as a result of this unlawful conduct is fruit of the poisonous tree and subject to suppression. Commonwealth v. Alvarez, 44 Mass.App.Ct. 531, 536 (1998) (defendants entitled to suppression of fruits of search when unlawful interrogation of passenger led to the search that produced cache of cocaine secreted in vehicle). Accordingly, because Trooper Kiely’s discovery of the bag containing $123,000 in the vehicle’s trunk was obtained during a search that resulted from the improper seizure of the defendants, this evidence must be suppressed.
2. Items Discovered in the Hide
With regard to the ski masks, badges, firearms and handcuffs, the defendants argue that the police performed an unlawful warrantless search of the vehicle at the police station, and that this search resulted in the discovery of the “hide” and the items therein. The Commonwealth argues that once the canine indicated narcotics on the money, the officers had probable cause to search the vehicle.[6] The Commonwealth’s position is unavailing.
Police officers may search a vehicle without a warrant once there is probable cause to believe that a vehicle contains contraband if the situation is exigent so as to render obtaining a warrant impracticable. Commonwealth v. Alvarado, 420 Mass. 542, 554 (1995); Commonwealth v. Wunder, 407 Mass. 909, 913 (1990). Furthermore, police officers are permitted to wait to search a vehicle until after it has been seized and removed to safe environs, provided they have probable cause to search the vehicle at the time it was detained in a public place. Commonwealth v. Markou, 391 Mass. 27, 29-30 (1984).
The Commonwealth is correct in its assertion that the very presence of the unclaimed $123,000 found in the trunk of the Taurus would have been sufficient to raise reasonable suspicion, had it been lawfully obtained by the police. See United States v. $14,665, 33 F.Sup.2d 47, 53 (1998) (“As many courts have noted, the presence of large quantities of cash reasonably raises suspicions as to its origins and the intent of its holder”). Furthermore, this reasonable suspicion would have been sufficient to conduct a canine search, Commonwealth v. Sinforoso, 434 Mass. 320, 324 (2001),[7] and the subsequent indication by Riggs of the presence of narcotics on the money would have provided probable cause to search the vehicle. Id. *652 citing Commonwealth v. Pinto, 45 Mass.App.Ct. 790, 793 (1998). This analysis, however, is inapplicable in light of the above conclusion that the bag of money found in the Taurus’ trunk was, in the first instance, obtained unlawfully. Without the discovery of the bag of money, the police would have had no reasonable suspicion, much less probable cause, to initiate either the canine check or the more intrusive search of the trunk. See Commonwealth v. Sinforoso, 434 Mass, at 324.[8] Accordingly, this Court finds that the search of the Taurus’ trunk was an indirect product of the previous unlawful search and seizure and that the objects discovered as a result must be suppressed. Commonwealth v. Ferrara, 376 Mass, at 505 (holding all evidence be suppressed “traceable to the [unlawfully seized) handgun”).
ORDER
For the reasons stated above, the defendants’ motions to suppress are ALLOWED.

Defendant Peralta waives that portion of his motion which seeks to suppress his statements. The other defendants have not identified any particular statements they wished to be suppressed.

Each of the defendants submitted separate motions to suppress.

In addition to these arguments, the defendants assert that the impoundment of the vehicle was improper. While it is likely that the troopers’ decision to impound the vehicle was proper, it is unnecessary to resolve this issue in order to dispose of the present motions. See Commonwealth v. Daley, 423 Mass. 747, 750 (1996) (“The impoundment of a vehicle for noninvestigatory reasons is generally justified if supported by public safety concerns or by the danger of theft or vandalism to a vehicle left unattended”); Commonwealth v. Caceres, 413 Mass. 749, 751 n. 2 (1992) (noting that if the owner of the vehicle is present and proposes that vehicle be turned over to a passenger, this should be done if the passenger displays a valid operator’s license and is not under arrest or otherwise incapacitated).

In this case, until the defendants reached the police station.

The Commonwealth also argues that the defendants’ failure to claim ownership of the money at the time of the search denies them present standing to move for suppression of the evidence. Indeed, a defendant is properly denied standing if he fails to demonstrate a substantial possessory interest in the item seized. Rakas v. Illinois, 439 U.S. 128, 138-39 (1978) (denying standing to automobile passengers who disavowed any interest in the car or its contents); Commonwealth v. Battle, 365 Mass. 472, 475 (1974) (denying standing to defendant who “had voluntarily given up all control over [drugs] and could have no expectation of privacy with respect thereto”). In the present case, however, the defendants’ denied of ownership of the money occurred after the commencement of the unlawful search. Thus, the money became the illegal fruit of that search and seizure, rather than evidence otherwise obtained during a lawful search after which the defendants denied ownership. See Commonwealth v. Loughlin, 385 Mass. 60, 63 (1982) (“Because the evidence in issue was traceable to the illegal pat-frisk of [the defendant] ... it must in these circumstances be suppressed as the ‘fruit of the poisonous tree’ ”).
Similarly, the consent to search the vehicle provided by one of the defendants (as yet unidentified) did not work to dispel the illegality of the search. In both Torres and Bartlett, the court suppressed evidence obtained as the result of an unlawful search, even though the defendants had subsequently given the police officer explicit consent to search the vehicle. Torres, 424 Mass, at 156; Bartlett, 41 Mass.App.Ct. at 470. Because the unidentified defendant’s consent came after the officers had already submitted the defendants to an unlawful seizure, the defendants could not subsequently confer permission for a valid search. See Torres, 424 Mass, at 157-59.

The Commonwealth has conceded that all of the defendants, as passengers, have standing to challenge the discovery of the item in the hide. See Commonwealth v. King, 389 Mass. 233, 240-41 (1983).

The court in Sinforoso noted that reasonable suspicion that drugs might be in a vehicle is sufficient to justify the use of a canine unit as a “less intrusive alternative to a full search.” 434 Mass, at 324.

Furthermore, the police cannot rely upon the inventory search exception to the warrant requirement in order to justify their actions. The use of a canine in conducting a search necessarily defeats any claim by the police that it was conducting an inventory search. Commonwealth v. Alvarado, 420 Mass, at 553 (police enlistment of the “assistance of a canine in conducting search” of a car made it “clear that the search . . . was of an investigatory nature and was not an inventory search”).