COMMONWEALTH *vs.* RUBEN DARIO TORRES.
COMMONWEALTH *vs.* LUIS C. HIDALGO.

Middlesex. December 5, 1996. - January 16, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Search and Seizure,* Threshold police inquiry, Automobile. *Constitutional Law,* Search and seizure.

In a criminal case, the record of a hearing on a motion to suppress evidence demonstrated that, after a State trooper lawfully stopped a motor vehicle for speeding and properly removed the passenger from the car for safety reasons, and after the driver produced a valid license and registration, the trooper had no basis for any further detention or inquiry of either the driver or the passenger; evidence subsequently seized in a warrantless search, based on the driver's purported consent while he was unlawfully detained, should have been suppressed. [157-164]

INDICTMENTS found and returned in the Superior Court Department on February 27, 1992.

Pretrial motions to suppress evidence were heard together by *Margot Botsford,* J.; the *Torres* case was then heard by *Howard J. Whitehead,* J., and the *Hidalgo* case by *Botsford,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review in the *Torres* case.

The Supreme Judicial Court granted a request for direct appellate review in the *Hidalgo* case.

*William Bloomer & Annemarie Relyea-Chew,* Assistant District Attorneys, for the Commonwealth.

*John C. McBride* for Ruben Dario Torres.

*Steven J. Rappaport* for Luis C. Hidalgo.

GREANEY, J. The defendants, Ruben Dario Torres and Luis C. Hidalgo, were each convicted, after separate jury-waived trials in the Superior Court, of trafficking in more than one hundred grams of cocaine, G. L. c. 94C, § 32E (*b*)

(3) (1992 ed.).[1] Each defendant had filed a motion to suppress invoking the Fourth Amendment to the United States Constitution and art. 14 of the Declaration of Rights of the Massachusetts Constitution. The motions to suppress were heard together by a judge in the Superior Court, who denied them in a memorandum of decision containing findings of fact and rulings of law. The principal issue raised in the defendants' motions was whether a State trooper lawfully could, in connection with a routine traffic stop, conduct a search of an automobile driven by Hidalgo and occupied by Torres as a front seat passenger.[2] During the search, the trooper seized a plastic shopping bag containing a number of small "baggies" of cocaine. In the Torres case, we granted the Commonwealth's application for further appellate review after the Appeals Court's decision vacating the order denying his motion to suppress and reversing his conviction. *Commonwealth* v. *Torres*, 40 Mass. App. Ct. 6 (1996). In the Hidalgo case, we granted the Commonwealth's application for direct appellate review. We conclude, in express reliance on art. 14, that the motion to suppress filed by each defendant should have been

---

[1]Each defendant was also indicted for conspiracy to traffic in cocaine. G. L. c. 94C, § 40 (1994 ed.). In the Torres case, the indictment charging this crime was placed on file without a change of plea. Hidalgo was convicted of the charge, and the conviction was placed on file with his consent. These indictments are not part of the appeal.

[2]Both defendants raise other issues on appeal. Torres argues that his motion for a required finding of not guilty should have been allowed because the Commonwealth's evidence was insufficient to establish that he was a joint venturer with Hidalgo or was in actual or constructive possession of the cocaine, the theories on which the Commonwealth proceeded against him at trial. The Commonwealth's evidence, considered under the governing test, see *Commonwealth* v. *Merola*, 405 Mass. 529, 533 (1989), was sufficient to warrant his conviction of trafficking in cocaine. We do not examine the issue in detail because, as we shall discuss subsequently in this opinion, much of the evidence relied on by the Commonwealth should have been suppressed, so the Commonwealth will have to decide whether it has enough remaining evidence to retry Torres and Hidalgo. See *Kater* v. *Commonwealth*, 421 Mass. 17, 18 (1995), and cases cited. Hidalgo claims that his motion to dismiss the indictments should have been allowed because the Commonwealth failed, pursuant to art. III (a) of the Interstate Agreement on Detainers, St. 1965, c. 892, to bring him to trial within 180 days after his request for a final disposition of the charges. Consideration of the issue is similar to a speedy trial analysis and, although Hidalgo was brought to trial 200 days after he initiated his request, it is clear that there are sufficient excludable periods to satisfy the 180-day requirement. The motion to dismiss, therefore, was properly denied.

allowed. Consequently, we vacate the orders denying the defendants' motions to suppress, reverse the judgments, and set aside the findings of guilty.

The judge's findings of fact may be summarized as follows. While on routine patrol on Route 3 in Bedford at about 10:35 A.M., Trooper Peter Cummings pursued an automobile which appeared to be speeding and signalled the automobile to pull over. The automobile, a two-door Renault, stopped in response to the trooper's signal. The trooper, who was in uniform and armed, approached the Renault from the passenger side and saw the passenger, Torres, with his back toward the passenger side window conversing with the driver, Hidalgo. About twenty seconds elapsed without a response from Torres, causing the trooper to knock on the passenger side window. Torres turned, looked at the trooper, opened the door, and started to get out. The trooper asked Torres what he was doing, and Torres responded that he did not speak English. The trooper was concerned by Torres's delayed response and his attempt to get out of the automobile, so for safety purposes, he directed Torres to go and wait at the rear of the vehicle.

Trooper Cummings then returned to the passenger side of the automobile, leaned in the open door, and asked Hidalgo for his license and registration. Hidalgo looked for the registration, opening and closing the glove compartment quickly. Hidalgo seemed nervous, but produced the necessary papers. In response to a series of questions, Hidalgo stated that the automobile belonged to his wife, that his passenger's name was Ruben Torres, and that he (Hidalgo) was coming from the Burlington Mall where he had been shopping for a radio. The license and registration furnished by Hidalgo were both from Massachusetts, neither had expired, and both appeared valid. The trooper noticed that the driver's license bore an address in Lowell known to him as an area associated with a high degree of drug activity. Trooper Cummings then asked Hidalgo where he was born, to which Hidalgo responded, Medellín, Colombia. From his training and experience, the trooper was aware that Medellín was a principal source of cocaine distribution.

The trooper then turned his attention to Torres who was still standing at the rear of the vehicle. In response to a question, Torres told the trooper, in English, that he was coming

from the Burlington Mall. Trooper Cummings asked Torres for identification; Torres indicated that he did not speak English. The trooper had Torres turn around and motioned for Torres's wallet by pointing to his rear pants pocket and opening and closing his hand. Torres produced his wallet for the trooper. Trooper Cummings opened the wallet and took out three folded pieces of paper that contained apparent notes of drug transactions, directions from Lowell to New York City, and a "money wire" receipt from Lowell to Medellin, Colombia. The wallet also contained a Florida driver's license, which appeared to be valid, with Torres's picture and in his name.

At or near the end of his conversation with Torres, Trooper Cummings looked through the rear window of the automobile and saw Hidalgo, who had remained in the automobile, move his right hand and arm in the area of his jacket pocket. Concerned for his safety, the trooper approached Hidalgo. The trooper patted the side of Hidalgo's jacket, felt a hard object, and recovered a telephone pager. In response to the trooper's questions, Hidalgo indicated that he was unemployed, but had received the pager as a gift. The trooper asked Hidalgo if there were drugs in the automobile. Hidalgo responded, "No, there's no drugs, search."

A search followed. Papers were seized from the glove compartment, and a plastic shopping bag was found hidden behind a hinged panel attached to the rear passenger side. The plastic bag contained a number of small baggies that contained white powder that the trooper believed was cocaine. Both defendants were arrested, informed of their Miranda rights, and transported to the State police barracks.

Based on these facts, the judge concluded that Trooper Cummings had properly asked for Hidalgo's license and registration in connection with a routine traffic stop. The production of valid papers by Hidalgo would have ended the encounter, were it not for, as the judge said, "the unusual behavior of Torres in exiting the passenger side of the vehicle without being asked to do so," an event that "was at least suspicious enough for Trooper Cummings to attempt to ascertain the passenger's identity as well." The judge considered the trooper's seizure and examination of Torres's wallet unlawful, but concluded that this part of the episode was of no legal consequence to Hidalgo who, the judge

explained, lacked standing to dispute the search of Torres's wallet and the seizure of personal items that belonged to him. Hidalgo's furtive gesture occurred near the end of the wallet search, and the judge concluded that this gesture authorized the pat-down of Hidalgo that produced the telephone pager. Next came the questioning of Hidalgo about drugs in the automobile that led to Hidalgo's invitation to search. The judge ruled that the invitation constituted a valid consent to search the entire automobile. Thus, the cocaine and other papers found in the automobile were ultimately determined to have been validly seized as the product of a consensual search. Finally, the judge concluded that the contents of Torres's wallet, taken during an unlawful search and seizure, were not subject to suppression because they would have been inevitably discovered during an inventory search of the wallet at the State police barracks where Torres was taken after his arrest. We accept the judge's historical facts because they are supported by the evidence, *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990), but exercise our independent judgment on the constitutional issues, *Commonwealth* v. *Robbins*, 407 Mass. 147, 151 (1990).

There is no question that the original stop of the automobile for speeding, and the threshold inquiry of Hidalgo in connection with the violation, were valid. The stop and inquiry proceeded in an uneventful manner with the production by Hidalgo of license and registration papers that appeared proper and identified Hidalgo. The trooper also elicited answers from Hidalgo that identified Torres and indicated where the two men had been before the stop. The stop, however, began to change character when the trooper decided to go to the back of the automobile to interrogate Torres. As the Appeals Court noted, Torres could reasonably harbor a higher expectation of privacy. Hidalgo, not Torres, had committed the speeding violation, and a passenger like Torres, in the absence of his own individual misbehavior or suspicious conduct, could expect that the formalities involved in the traffic stop would take place solely between the driver and the trooper. *Commonwealth* v. *Torres, supra* at 13, and cases cited.

There also can be no doubt that, at the time when the trooper focused his attention on Torres, both Hidalgo and Torres were seized and would continue to be seized until

some indeterminate future time. A person has been "seized"
by a police officer "if, in view of all the circumstances sur-
rounding the incident, a reasonable person would have
believed that he was not free to leave." *Commonwealth* v.
*Borges*, 395 Mass. 788, 791 (1985), quoting *United States* v.
*Mendenhall*, 446 U.S. 544, 554 (1980). See *Commonwealth* v.
*Stoute*, 422 Mass. 782, 786 & n.8 (1996), and cases cited.
Reasonable persons in the position of Hidalgo and Torres
would not necessarily know that Hidalgo had satisfactorily
complied with the reason for the stop, and they would not
feel free to walk away while the trooper persisted in question-
ing them. See *Berkemer* v. *McCarty*, 468 U.S. 420, 436 (1984)
("Certainly few motorists would feel free either to disobey a
directive to pull over or to leave the scene of a traffic stop
without being told they might do so"). Further, because the
defendants had been seized, the interrogation of Torres could
not, as the judge appears to have recognized, be upheld on
the line of cases that permit police examination of a person
(including a request for identification) that is consensual in
nature. These inquiries are constitutionally proper because
the police do not convey a message that compliance with
their requests is required, and consequently, the encounters
invoke no restraint on the person's liberty. See generally *Flor-
ida* v. *Bostick*, 501 U.S. 429, 434 (1991); *INS* v. *Delgado*, 466
U.S. 210, 216 (1984).

It is well settled that a police inquiry in a routine traffic
stop must end on the production of a valid license and
registration unless the police have grounds for inferring that
"either the operator or his passengers were involved in the
commission of a crime . . . or engaged in other suspicious
conduct" (citations omitted). *Commonwealth* v. *Torres, supra*
at 9. The dispositive issue, therefore, is whether, after Hidalgo
had complied with the usual requirements associated with a
speeding violation, a legally sufficient basis existed, in terms
of reasonable suspicion grounded in specific, articulable facts,
with direct reference to Torres for the trooper to go to the
rear of the automobile to question him further.[3] The judge
discerned such a basis in "the unusual behavior of Torres in

[3]We note here that Hidalgo had already told the trooper that his pas-
senger was "Ruben Torres," an identification that proved correct. Hidalgo
also told the trooper that the two men had been shopping at the Burlington
Mall, an assertion later repeated by Torres. There is no indication that the

exiting the passenger side of the vehicle without being asked to do so."[4]

Such behavior is insufficient to support the continued detention. It is not unnatural for either the driver or the passenger in an automobile (or both) to get out of the vehicle to meet a police officer who has signalled the vehicle over to the side of the road. The case for reasonable suspicion is also not strengthened by the slight delay occasioned by Torres's conversing with Hidalgo when the trooper approached the passenger side of the automobile. There is nothing known about the substance of their conversation, and from all that appears, Torres may have assumed that the trooper was approaching the vehicle from the driver's side, unaware that the trooper was standing beside the automobile on the passenger side waiting to be acknowledged. (The driver's side is a common point of approach by a police officer in many traffic stops.) The delay before the trooper knocked on the window, and Torres got out of the automobile, justified the trooper's initial concern and his removal of Torres to the rear of the automobile for safety purposes. See *Commonwealth* v. *Silva*, 366 Mass. 402, 406-407 (1974). Torres's actions, however, did not otherwise justify any greater suspicion. "[O]nce any potential threat to the officer's safety was dispelled and there was no reasonable suspicion that criminal activity was afoot, any basis for further detention evaporated. See *Commonwealth* v. *Ferrara*, 376 Mass. [502, 504-505 (1978)] (no basis to interrogate passengers after driver produced valid license and registration); *Commonwealth* v. *Loughlin*, 385 Mass. 60, 61-62 & n.3 (1982) (search conducted after justifiable threshold inquiry wherein driver produced valid license and registration held impermissible); *Commonwealth* v. *King*, 389 Mass. [233, 244 (1983)] (once officer verified driver's and passenger's li-

Burlington Mall was not open at the time, or that Hidalgo and Torres could not have traveled from the mall to the place of the stop between the time the mall had opened and the time of the speeding violation.

[4]We think the judge correctly put no weight on the findings that the trooper had noticed from an inspection of Hidalgo's license that Hidalgo appeared to live in an area of Lowell known for drug activity and had told the trooper that he was born in Medellin, Colombia, a place the trooper had learned was a principal source of cocaine. The judge merely noted these revelations as part of the historic facts. They pertained solely to Hidalgo, who had satisfied the trooper's demands of him, and one of the facts (place of birth) is singularly devoid of incriminatory implications.

censes and vehicle registration, no grounds existed for further investigation or precautions); *Commonwealth* v. *Figueroa*, 18 Mass. App. Ct. [967, 967-968 (1984)] (defendant, who was properly stopped for speeding, and who produced valid license and registration, should have been free to continue on his way; officer's subsequent warrantless search held illegal where evidence did not demonstrate that trooper had reasonable belief that defendant was armed and dangerous); *Commonwealth* v. *Kimball*, 37 Mass. App. Ct. 604, 607 (1994) (once driver produced valid license and registration, he should have been permitted to leave). Contrast *Commonwealth* v. *Vanderlinde*, 27 Mass. App. Ct. 1103, 1104 (1989) (where officers chased vehicle before it stopped, and then saw passenger reach into the well between the car seats, court held that this was not a routine traffic stop which normally terminates with presentation of a valid license and registration); *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. [311, 314 (1992)] (trooper may investigate passengers upon driver's failure to produce valid license)." *Commonwealth* v. *Torres, supra* at 9-10.

Two other recent decisions of the Appeals Court further support this conclusion. In *Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. 468 (1996), a State trooper stopped an automobile for speeding on the Lowell Connector in Lowell. The automobile was driven by an Hispanic male, Felix Luna; William Bartlett, one of four passengers, occupied the front passenger seat. Luna produced facially valid license and registration documentation and answered the trooper's questions about where he was coming from and where he was going. Not satisfied, the trooper, based on the circumstances listed below,[5] ordered Luna out of the automobile, continued his questioning, and eventually ordered Bartlett out. Shortly thereafter, the trooper discovered what appeared to be cocaine in the automobile.

---

[5]According to the Appeals Court, the trooper's suspicions were aroused by the following circumstances:

"(1) the car was rented and he knew drug couriers used rented cars;

"(2) the car had been rented at Logan Airport and [the trooper] knew Logan was a point of entry for drugs (in point of fact it turned out that the car had not been rented at Logan Airport, but at the Park Plaza Hotel in Boston);

In circumstances arguably stronger than the circumstances here, the Appeals Court held that the stop should have ended after Luna had furnished proper documentation and received whatever penalty the trooper chose for the speeding violation. The Appeals Court put the analysis in these terms: "While alert police officers may add up suggestive factors, each of which is insufficient alone to support a search or arrest, *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. at 314-315, the factors we have enumerated are singular for not, when fairly viewed, being suggestive. Compare *Commonwealth* v. *Bacon*, 381 Mass. 642, 645 (1980). Contrast *Commonwealth* v. *Rivera*, *supra* at 314-315. Adding up eight innocuous observations — eight zeros — does not produce a sum of suspicion that justifies a line of interrogation, an order of persons out of their car, and a search of their car. It is apparent that [the trooper] played a good hunch and fished until he caught something. The vice in interrogations and searches based on a hunch is their essentially random and arbitrary nature, a quality inconsistent, under constitutional norms (art. 14 of the Declaration of Rights of the Massachusetts Constitution and the Fourth Amendment to the Constitution of the United States), with a free and ordered society. See the concurring opinion of Chief Justice Hennessey in *Commonwealth* v. *Loughlin*, 385 Mass.

---

"(3) the car was not rented to Luna or, presumptively, either of the two passengers riding with him;

"(4) Luna's operator's license showed him to be a resident of Cambridge and it was odd that he should rent a car for a local trip;

"(5) it seemed unlikely that Luna would be driving from Boston to Lowell and back to pick up a carpenter, [the reason given by Luna];

"(6) there were no construction tools or materials in the passenger compartment of the car;

"(7) Luna and Bartlett wore beepers and he associated beepers with drug dealers;

"(8) [the trooper] was aware that there had been drug seizures on the Lowell Connector and, indeed, had himself made arrests on the Lowell Connector related to drug traffic."

*Commonwealth* v. *Bartlett*, 41 Mass. App. Ct. 468, 469-470 (1996).

at 64-66. See also *Commonwealth* v. *Kimball*, 37 Mass. App. Ct. at 607-608." *Commonwealth* v. *Bartlett, supra* at 472.

In *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554 (1996), a police officer stopped an automobile after he had observed erratic operation. The vehicle contained the driver and four passengers, two in the front seat with the driver and two in the rear seat. The officer noticed a furtive movement by one of the rear seat passengers, who appeared to be bending forward as if to place an object under the seat in front of him. The officer asked the driver to step out of the automobile, checked her license and the registration and found both valid. He also concluded that she had not been operating while under the influence of intoxicating liquor, the initial suspicion that had led the officer to stop the automobile. Despite these determinations, the officer then ordered the owner and one of the passengers out of the automobile. There followed a series of events, culminating in a search of the vehicle, and all the persons in it, and the discovery of drugs.

The Appeals Court held that the police officer's inquiry should have concluded after the driver had produced a valid license and registration, and the officer had determined that no traffic offense had been committed. *Commonwealth* v. *Ellsworth, supra* at 556-557. The furtive movement of one of the passengers, observed by the officer when he stopped behind the automobile, justified the initial precautions taken for his safety. But that movement could not justify the officer's exit orders after he determined the validity of the driver's license and the registration, and no other basis existed to continue to detain the vehicle's occupants. *Id.*[6]

The authority referred to, and discussed above, applies the settled principle that "[a] justifiable threshold inquiry permits a limited restraint of the individuals involved as long as their detention is commensurate with the purpose of the stop. *Florida* v. *Royer*, 460 U.S. 491, 500 (1983). *Commonwealth* v.

---

[6]In *Commonwealth* v. *Davis*, 41 Mass. App. Ct. 793 (1996), the Appeals Court concluded that a pat frisk of a driver of an automobile who had produced a valid license and registration in connection with a routine traffic stop was not justified. Even though the driver appeared nervous, she cooperated with the trooper's requests and nothing suggested that the driver might be armed or dangerous. *Id.* at 796-797. The seizure of marihuana as a result of the pat frisk, therefore, was suppressed because the driver should have been let go once the formalities of the traffic stop had been completed.

*Borges*, 395 Mass. 788, 794 (1985).''[7] *Commonwealth* v. *Ellsworth*, *supra* at 557. Here, the continued detention of Hidalgo and Torres was no longer necessary after Hidalgo had satisfied the purpose of the stop (speeding) by producing his license and registration.[8] It follows that all of the evidence seized after the primary illegality — the continued detention of both men after Hidalgo had produced a valid license and registration — should be suppressed as the fruit of the poisonous tree because a consent obtained during an illegal detention is ineffective to justify an otherwise invalid search. *Florida* v. *Royer*, *supra*. See *Florida* v. *Bostick*, 501 U.S. 429, 433-434 (1991); *Commonwealth* v. *Loughlin*, *supra* at 63.

The orders denying the defendants' motions to suppress are vacated. Hidalgo's conviction of trafficking in cocaine is reversed, and the finding of guilty is set aside. Torres's conviction of trafficking in cocaine is reversed, and the finding of

---

[7]Brief discussion is appropriate of the decision of the United States Supreme Court in *Ohio* v. *Robinette*, 117 S. Ct. 417 (1996). There, a deputy sheriff continued to detain the defendant, a driver who had been stopped for speeding, after the defendant had produced a valid license, and a computer check had indicated no previous violation. The deputy questioned the defendant about "illegal contraband" in the automobile and ultimately received the defendant's consent to search the vehicle, a search that led to the discovery of illegal drugs. The majority opinion held that, prior to asking the defendant for permission to search, it was not necessary, as the Supreme Court of Ohio had held, for the deputy to advise the defendant that he was free to leave. The majority opinion appears to have assumed, without any express comment or discussion, that the deputy's continued detention of the defendant, after the check of his license and driving record, was proper, at least in the sense that the defendant had voluntarily continued to converse with the deputy and to respond to questions. The holding of the decision, therefore, is a narrow one: The United States Constitution does not require that a lawfully seized person be told by the police that he is "free to go" before the person's consent to search will be recognized as voluntary. The decision has no application to the established line of authority that governs the present situation.

[8]We agree with the Appeals Court that the order of events is critical in this type of case, and the order of events is what renders this search and seizure improper. See *Commonwealth* v. *Loughlin*, 385 Mass. 60, 62 n.3 (1982) ("no amount of suspicion short of probable cause could save [further police action] that *follows* the justifiable threshold inquiry"). "[H]ad the trooper requested identification from the defendant before he verified the driver's license and registration, it would have been a permissible threshold inquiry." *Commonwealth* v. *Torres*, 40 Mass. App. Ct. 6, 13 n.5 (1996), and cases cited.

guilty is set aside. It appears doubtful that the Commonwealth has enough evidence to reprosecute the defendants, but we will leave the final decision on that matter to the district attorney and the trial court.

*So ordered.*