Rufo, Robert C., J.
The defendant, Pedro Mateo-German, was indicted for trafficking in a Class “A” controlled substance having a net weight of 200 grams or more in violation of G.L.c. 94C, §32E(c)(4), and trafficking in a Class “B” controlled substance having a net weight of 100 grams or more in violation of G.L.c. 94C, §32E(b)(3). He now moves to suppress evidence seized without a warrant and further moves to suppress any and all statements made by him to any police officer on June 9, 2006.
An evidentiary hearing was held on May 24 and May 29, 2007. For the reasons set forth below, defendant’s motion to suppress is ALLOWED.
FINDINGS OF FACT
Based on all the credible evidence and the reasonable inferences drawn therefrom, the Court finds the following facts. On June 9, 2006, at approximately 7:35 p.m., while on routine patrol in a marked cruiser, Massachusetts State Police Trooper Robert Gilmore (“Gilmore”) was traveling south on Route 140, Freetown, Massachusetts, with his K-9, Buster.[1] Route 140 is a four-lane divided highway, two lanes in each direction, with a posted speed limit of 55 miles per hour. As Gilmore approached a slower-moving maroon Acura sedan, he noticed that the vehicle was abruptly slowing down and had activated its four-way emergency hazard lights. As Gilmore drove past the maroon Acura, he saw it pull into the breakdown lane, whereupon he immediately pulled his cruiser into the breakdown lane some 40 yards ahead of the Acura. Gilmore activated his blue lights, backed up his cruiser, and parked directly behind the Acura. The operator of the Acura immediately exited the vehicle and approached Gilmore indicating he needed assistance. He said, “I’m out of gas, what should I do?” Gilmore offered a AAA *622 tow-truck, and the operator declined, indicating that he preferred to use his cell phone to call a friend who would bring gasoline to the scene. With Gilmore’s assistance, the operator made a further attempt to start the vehicle, without success. He then made a phone call from his cell phone while standing near the passenger side of the Acura.
Gilmore observed that the Acura had heavily tinted windows and that the front windows were rolled down, which enabled him to see inside the vehicle where he observed several empty and full bottles of water in the rear of the vehicle. Gilmore also noticed an air freshener hanging from the rear-view mirror and smelled a strong odor of air freshener coming from inside the vehicle. While waiting for the gasoline to arrive, Gilmore engaged in further conversation with the operator, who appeared a bit nervous and indicated that he had been shopping for clothing at the Taunton Mall. Gilmore did not notice any shopping bags in the passenger compartment of the Acura. The operator indicated that he was unemployed, had recently moved from Boston to New Bedford, and had purchased the Acura, which was registered to his girlfriend, approximately seven months prior. Gilmore inquired about the Massachusetts Fish and Wildlife special number license plate affixed to the Acura and commented that “it must be nice to support something that you believe in.” When the operator did not respond to this comment, Gilmore asked if his girlfriend was “into fish and wildlife.” The operator answered, “yeah, I think so.” These conversations took place over a period of approximately 20 to 30 minutes while awaiting the arrival of the operator’s friend with the gasoline.
At this point, Gilmore asked the operator for his license and registration, which was readily produced from inside the Acura. The operator of the Acura was identified as Pedro Mateo-German (Mateo-German), and the vehicle was registered to a Ruabaca E. Rivera of New Bedford. The original purchase date of the vehicle was November 1, 2005, and a Massachusetts Fish and Wildlife number plate (FW4233) was issued on April 7, 2006. Gilmore returned to his cruiser to conduct a computer check of Mateo-German’s license and the vehicle’s registration. Mateo-German was permitted to sit in the driver’s seat of the Acura while Gilmore performed the computer check from inside his cruiser. A check of Mateo-German’s license and the vehicle’s registration revealed that Mateo-German had a valid license to operate and no outstanding warrants, and that the vehicle had not been reported stolen.
Due to the location of the vehicle and the positioning of the state police cruiser in the breakdown lane of Route 140, Gilmore exited his cruiser and approached the Acura on the passenger side. He returned Mateo-German’s license and registration through the passenger-side window while Mateo-Ger-man remained seated in the driver’s seat. Gilmore observed Mateo-German’s wallet on the dashboard and also noticed a bulge in the right-pocket area of Mateo-German’s pants. Gilmore asked Mateo-German if he had any weapons on his person and received an affirmative response, whereupon Mateo-German removed a small pocket knife from his pants pocket and handed it to Gilmore. Gilmore noticed that a bulge remained in Mateo- German’s pants pocket and inquired further about the bulge, whereupon Mateo-German indicated that he had a “wad of cash” remaining in his pocket. Gilmore did not ask Mateo-German to produce the wad of cash from his pants pocket at that time. Later, after Mateo-German was placed in custody, the wad of cash was inventoried which amounted to $306.00.
At this juncture, Gilmore asked Mateo-German if he would consent to an exterior search of the Acura by his narcotics-trained K-9, Buster. Mateo-German responded in the affirmative, indicating that “he had nothing to hide.” Gilmore retrieved his K-9 from his cruiser while Mateo-German watched from the front of the Acura, a distance of approximately 30 feet away. The K-9 performed an exterior “sniff’ of the vehicle, starting at the rear license plate and proceeding counterclockwise from the passenger side of the vehicle around the front to the front-driver’s side window. At the front of the Acura, Gilmore noticed a behavioral change in his K-9 when the dog’s snout pointed toward the open driver’s side window. Gilmore understood this to be an indicator from his K-9 detecting a scent of narcotics emanating from inside the vehicle. He asked Mateo-German if there were narcotics in the Acura or if there had ever been narcotics in the vehicle. Mateo-German responded that he has friends who borrow the Acura from time to time and that they smoke marijuana in it. He stated that he regularly uses air freshener because he doesn’t like the smell of marijuana inside the Acura.
Next Gilmore asked if he could search the interior of the vehicle with his K-9, and Mateo-German responded, “no problem.” The K-9 entered the Acura, proceeded to the rear seat area and Gilmore noticed another behavioral change when the K-9 stuffed his snout under the rear seat, partially lifting it up. Gilmore understood this action by his K-9 to be scent recognition indicating the presence of a narcotic odor. Gilmore removed the K-9 from the Acura and secured the dog in his cruiser.
Returning to the rear seat area of the Acura, Gilmore conducted a closer examination and saw a wooly, insulation-type fabric under the seat cushion. Gilmore felt the top of what he described as a sharp sheet metal door, four inches by eight inches wide, to a hidden compartment cut into the gas tank area of the Acura. While opening this compartment, he saw objects wrapped in both clear and green cellophane. Upon further examination, Gilmore saw a brownish-colored *623 material in the clear cellophane wrap, recognizing it to be suspected heroin. At this point, Gilmore noticed Mateo-German talking on his cell phone and observed a pickup truck pull into the breakdown lane ahead of the Acura. Gilmore returned the objects he had retrieved from the hidden compartment and focused his attention on Mateo-German, who asked if he could “gas” the vehicle. Gilmore walked to the rear of his cruiser and called for backup. Within a few moments, backup arrived, and Gilmore and other officers secured both Mateo-German and the driver of the pickup, placing them in restraints.
In the compartment inside the Acura, Gilmore discovered six clear cellophane packages and four green cellophane packages. Further drug analysis revealed 500 grams of heroin and 150 grams of suspected cocaine. Mateo-German was given his Miranda rights and the driver of the pickup truck who brought the gasoline was allowed to leave the area. Two days prior to the encounter with Mateo-German, Gilmore had attended a three-full-day training session regarding “conducting complete traffic stops and factors to be considered as indicators of the presence of narcotics in motor vehicle searches.”
RULINGS OF LAW
I. Threshold Inquiry
Gilmore’s approach of the defendant’s vehicle and initial questioning of the defendant were justified as falling within the community caretaking function of the police. “Not all personal intercourse between policemen and citizens involves ‘seizures’ of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a ‘seizure’ has occurred.” Commonwealth v. Leonard, 422 Mass. 504, 508 (1996), quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968). Local police officers are charged with community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to commission of a crime. Commonwealth v. Evans, 436 Mass. 369, 372 (2002). Thus, for example, police officers may permissibly check on motorists parked in a rest area or open the unlocked door of a vehicle parked in a breakdown lane to determine whether a motorist is in need of assistance. Id. at 372-73.
Gilmore’s stopping to determine whether Mateo-German needed assistance after he ran out of gas on a state highway falls under the police community caretaking function. Initially, Gilmore attempted to render aid to a stranded motorist on a busy highway by activating his blue lights and positioning his cruiser behind Mateo-German’s disabled Acura. An approach by police to check on the status of a vehicle and its occupants is a routine inquiry which is a minimal intrusion on the defendant and does not require judicial justification. Evans, 436 Mass. at 373. Thus, Gilmore’s actions in initially approaching and questioning the defendant were a proper performance of his community caretaking function, and not an investigation of criminal activity raising constitutional concerns.
In addition, a police officer is justified in requesting to see a driver’s license and registration when performing community caretaking functions involving a disabled vehicle. Evans, 436 Mass. at 374-75. Such a request involves a minimal intrusion on the defendant’s rights and does not involve an improper seizure. Id. at 375. Thus, Gilmore’s request to examine Mateo-German’s driver’s license and registration was appropriate.
II. The Canine Sniff
The critical question in this case is whether, after confirming that Mateo-German’s license and registration were valid, Gilmore was justified in further detaining him and subjecting his vehicle to a canine sniff. In order to expand a threshold inquiry of a motorist and prolong his detention, police must reasonably believe that there is further criminal conduct afoot, based on specific and articulable facts and the reasonable inferences which follow from such facts in light of the officer’s experience. Commonwealth v. Feyenord, 445 Mass. 72, 77 (2005), cert. den., 126 S.Ct. 1369 (2006). Police inquiry in a routine stop must end with the production of a valid license and registration unless the police have grounds for inferring that the operator was involved in the commission of a crime or engaged in other suspicious conduct. Commonwealth v. Torres, 424 Mass. 153, 158 (1997).
Here, Gilmore cited the following factors, based in part on his recent training session, in support of his belief that criminal activity was afoot: Mateo-German approached the cruiser while it was backing up on the highway; the windows of Mateo-German’s car were heavily tinted; there were a number of water bottles in the car, both empty and full; there was a strong smell of air freshener coming from the car; there were no shopping bags in the passenger compartment of the car, despite Mateo-German’s claim that he had been shopping; Mateo-German’s lack of knowledge regarding the Fish and Wildlife license plate on the Acura; the fact that Mateo-German was unemployed, but was driving a 1999 Acura; and Mateo-German’s overall nervousness. In addition, when Gilmore returned Mateo-German’s driver’s license and registration to him, he noticed a bulge in the defendant’s pants pocket, which led to Mateo-German voluntarily admitting to being in possession of a small pocket knife and a wad of cash.
Alert police officers may add up suggestive factors, each of which is insufficient alone to support a search, in order to support a reasonable suspicion that criminal activity is afoot. Torres, 424 Mass. at 161; see also Commonwealth v. Fraser, 410 Mass. 541, 545 (1991) (combination of factors that are each innocent to themselves may, when taken together, amount to the *624 requisite reasonable belief). However, ”[a]dding up eight innocuous observations — eight zeros — does not produce a sum of suspicion that justifies a line of interrogation, an order of persons out of their car, and a search of their car.” Torres, 424 Mass. at 161. Here, the circumstances cited by Gilmore are completely innocuous and do not, even considered as a whole, give rise to a reasonable suspicion of criminal activity. When broken down on a state highway, it is not uncommon for a motorist to walk toward a police officer who has stopped to offer assistance. Nor is it uncommon to have heavily tinted windows, water bottles both empty and full, and excessive air freshener in one’s vehicle.
The bulge in Mateo-German’s pants warranted further inquiry by Gilmore. Commonwealth v. Loughlin, 385 Mass. 60, 62 (1982) (police justified in extending scope of inquiry where facts warranted reasonable person in believing that defendant was armed and dangerous). However, Gilmore quickly dispelled any fear of a dangerous weapon when the defendant voluntarily handed over a small pocket knife, which it is not illegal to possess.[2] While continuing to inquire concerning the bulge in Mateo-German’s pants pocket after retrieving the pocket knife, Gilmore accepted Mateo-German’s explanation regarding having a wad of cash without further investigation. It is not uniquely indicative of criminal activity or drug distribution, in particular, to possess a small pocket knife or a wad of cash. Finally, the fact that Mateo-German was nervous, without more, is not significant. All of the circumstances cited by Gilmore, viewed collectively, simply do not produce a reasonable suspicion of criminal activity. See Loughlin, 385 Mass. at 62 (once operator of disabled vehicle produced a valid driver’s license and registration, any justifiable investigation was complete and police lacked reasonable suspicion for further inquiry despite fact that when officer pulled up, the driver quickly ducked out of sight before jumping out of the vehicle and walking rapidly toward police cruiser to give officer his license and registration, and officer noticed bulges in the defendant’s pants which turned out to be cash); cf. Feyenord, 445 Mass. at 78-79 (reasonable suspicion found where a driver was unable to produce valid identification, he and his passenger gave inconsistent statements regarding their identities and destination, and police officer had cause to place the driver under arrest); Commonwealth v. Sinforoso, 434 Mass. 320, 322-23 (2001) (reasonable suspicion found where police officer observed two large knives, both of which were in obvious violation of a city ordinance, and a club on the floor of car’s front compartment, and upon retrieving those weapons for safety purposes, noticed evidence of a hidden compartment in the vehicle).
It is apparent in this case that Gilmore “played a good hunch and fished until he caught something.” Torres, 424 Mass. at 161. A search or interrogation based on such hunches, however, is inconsistent under constitutional norms due to their essentially random and arbitrary nature. Id. After Gilmore determined that Mateo-German did not need assistance, was not carrying a weapon, and could produce a valid license and registration, further inquiry was not necessary or justified. Gilmore’s investigation should have terminated at that point.
The question remains whether Gilmore was permitted to expand the scope of the threshold inquiry to subject the defendant’s car to a canine drug sniff despite the lack of reasonable suspicion. A canine sniff of a properly stopped vehicle is not a search under Article 14 of the Massachusetts Declaration of Rights. Feyenord, 445 Mass. at 82-83, citing Illinois v. Caballes, 543 U.S. 405, 409 (2005) (holding that a dog sniff during a lawful traffic stop is not a search within the meaning of the Fourth Amendment). Under the Fourth Amendment, the police may initiate a canine sniff of a vehicle stopped for a traffic offense even in the absence of any suspicion of criminal activity beyond the traffic violation. Illinois v. Caballes, 543 U.S. at 407-08. However, Article 14 often provides additional protections to drivers and occupants of motor vehicles that have not been recognized under the Fourth Amendment. Commonwealth v. Gonsalves, 429 Mass. 658, 662 (1999).
The Supreme Judicial Court has never explicitly ruled on whether police may initiate a canine sniff of a properly stopped vehicle without any reasonable suspicion of criminal activity. Feyenord, 445 Mass. at 80 n.7. It is unlikely, however, that the SJC would sanction such a result. In Feyenord, the court concluded that where a police officer possesses specific and articulable facts during a traffic stop to support the belief that the operator is involved in criminal activity, it may be reasonable in some circumstances for the officer to conduct a canine sniff of the exterior of the vehicle in order to confirm or dispel the possibility of drug transportation. Feyenord, 445 Mass. at 78-80. Thus, for example, where a defendant pulled over for a traffic violation was unable to produce a driver’s license, the inquiring police officer was unable to otherwise ascertain the defendant’s identity, the defendant was visibly nervous and shaking, and the officer’s initial inquiry of the driver and his passenger turned up “significant inconsistencies” regarding their identities and destination, police had a reasonable suspicion that the defendant and his passenger were engaged in criminal activity beyond the traffic violation and nonpossession of a driver’s license, and the possibility of drug-related activity was sufficient to warrant further detention of the vehicle for the purpose of conducting a canine sniff. Id. at 77-81.
The Feyenord decision establishes that, at a minimum, an officer’s decision to conduct a canine sniff on a lawfully stopped vehicle must be reasonable under the circumstances. However, several justices have suggested the need for an even higher standard *625 under which a canine sniff is permissible only if the officer has reasonable suspicion that drugs may be discovered in the stopped vehicle. See Feyenord, 445 Mass. at 89-92 (Greaney, J., concurring). Justice Greaney has opined:
A police officer conducting a traffic stop may not summon a canine officer and dog on a mere hunch or unarticulated suspicion that drugs might be discovered in the vehicle. Nor may the officer continue to engage the vehicle’s occupants in arbitrary or dilatory questioning, thus surreptitiously enlarging the duration and scope of the stop, in the expectation that circumstances may turn up justification, or consent obtained, to initiate a dog sniff of the vehicle.
445 Mass. at 89-90 (Greaney, J., concurring); see also id. at 91-92 (Marshall, C.J. and Ireland, J., dissenting) (opining that use of drug-detection dog is justified during routine traffic stop only if police have reasonable suspicion that detained individual is engaged in illegal drug activity).
Applying the minimum standard of reasonableness under the circumstances, the use of a drug-sniffing canine in this case does not pass muster. In upholding the canine sniff in Feyenord, the SJC explicitly distinguished that case from those in which the driver of a vehicle, as in the present case, produces a valid driver’s license and registration. Feyenord, 445 Mass. at 78 n.5; see also id. at 79 n.8 (discussing case in which dog sniff was held to be improper detention and expansion of investigation after uneventful inquiry in which traffic violator produced valid license and registration); id. at 93 n.2 (Marshall, C.J. and Ireland, J., dissenting) (opining that once police complete legitimate investigation, they cannot without reasonable suspicion detain motorist further to await arrival of dog). At the time Gilmore returned Mateo-German’s license and registration, he was aware that the defendant had a friend on the way with gasoline and did not need automobile assistance. Further, as discussed supra, Gilmore did not have reasonable suspicion to believe that any criminal activity was afoot, drug-related or otherwise. A hunch was the sole basis for Gilmore’s decision to subject Mateo-German’s vehicle to a canine sniff. Under the reasonableness standard of Feyenord, the use of a drug-sniffing canine in this case was not a proper investigative technique. Cf. Sinforoso, 434 Mass. at 325 (officer justified in detaining vehicle for canine sniff where events during stop gave rise to reasonable suspicion that vehicle contained contraband); Commonwealth v. Pinto, 45 Mass.App.Ct. 790, 792 (1998) (proper for police to temporarily detain package to expose it to canine sniff where there was reasonable suspicion that it contained contraband). Gilmore exceeded the permissible scope of the threshold inquiry by subjecting the defendant’s car to a canine drug sniff, warranting suppression of the contraband seized.
III. Consent
The final issue before this Court is whether the seizure of contraband was permissible because Mateo-German consented to the canine sniff. When the Commonwealth relies upon consent to justify the lawfulness of a search, it bears the burden of proving that the consent was freely and voluntarily given. Commonwealth v. Krisco Corp., 421 Mass. 37, 46 (1995). Consent is made freely and voluntarily when it is given unfettered by coercion, express or implied. Id. In order to satisfy this burden, the Commonwealth must show that the consent was something more than “acquiescence to a claim of lawful authority.” Commonwealth v. Rogers, 444 Mass. 234, 237 (2005); Krisco Corp., 421 Mass. at 46. Voluntariness of consent is a question of fact to be determined in the circumstances of each case, considering factors such as police behavior, police employment of trickery or deceit, and the defendant’s age, cognitive ability, and level of education. Rogers, 444 Mass. at 238; Commonwealth v. Burgess, 434 Mass. 307, 310-11 (2001).
Consent obtained during an illegal detention is generally ineffective to justify an otherwise invalid search. Torres, 424 Mass. at 163; Commonwealth v. Yehudi Y, 56 Mass.App.Ct. 812, 817 (2002). Evidence which is traceable to an illegal detention must be suppressed as fruit of the poisonous tree unless there is sufficient attenuation between the prior illegal conduct and the defendant’s consent to permit the court to conclude that the consent was an act of free will. Loughlin, 385 Mass. at 63. The sequence of events in this case demonstrates that Mateo-German’s consent to the canine sniff was no more than an acquiescence to a claim of lawful authority, tainted by Gilmore’s improper extension of the threshold inquiry. Mateo-German’s consent followed an unnecessarily prolonged encounter with Gilmore in which the officer persisted in questioning the defendant despite the fact that he did not require automobile assistance, posed no safety threat, and produced a valid license and registration. Mateo-German effectively was stranded at the scene until his friend arrived with gasoline and had no realistic ability to terminate Gilmore’s inquiry. In addition, Gilmore did not advise German-Mateo of his right to refuse to consent to the search. See Krisco Corp., 421 Mass. at 46 (although not determinative, such advice is relevant with regard to the voluntariness of the consent). Finally, no significant time elapsed between the point when Gilmore improperly continued the encounter after verifying that Mateo-German had a valid license and registration and the point when Mateo-German allegedly gave his consent. Thus, no intervening event occurred to dissipate the taint of the illegality. See Loughlin, 385 Mass. at 63-64 (operator’s consent not voluntary where obtained immediately after vehicle exit order which was improper because he had produced valid license and registration and investigation should have been complete); *626 Yehudi Y, 56 Mass.App.Ct. at 818 (consent not voluntary where given immediately after illegal entry into house by police); Commonwealth v. Ellsworth, 41 Mass.App.Ct. 554, 556-57 (1996) (owner’s consent to search car not voluntary where obtained immediately after exit order which was improper because police had concluded legitimate inquiry by determining that operator had valid license and registration). Based on the totality of the circumstances, the Commonwealth has not satisfied its burden of proving that Mateo-German’s consent to perform a canine sniff on the Acura was freely and voluntarily given so as to justify the search. Accordingly, all of the evidence seized as a result of the canine sniff must be suppressed.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion to suppress evidence seized by police on June 9, 2006 is ALLOWED.

This court found Trooper Gilmore to be most credible, forthright and professional.

Mateo-German was not charged with any crime in connection with his possession of the pocket knife.