Kern, Leila R., J.
The defendant, Daniel Hibbard, was indicted on the charge of trafficking cocaine. Hibbard moves to suppress physical evidence obtained during a vehicle search following his arrest. *229 This court conducted an evidentiary hearing over two days and received eleven exhibits. For the following reasons, the Motion to Suppress is DENIED.
Findings of Facts
This court heard testimony from Captain Brian Gilligan, an officer of the Salem Police, and received exhibits on July 16, 2008 and January 14, 2009. Based on the weight of the credible evidence and reasonable inferences drawn therefrom, this court finds the following facts. On June 26, 2007, Capt. Gilligan was traveling along Essex Street in Salem, Massachusetts, on his way to a private detail for the Department of Public Works. Capt. Gilligan was dressed in his police uniform and driving an unmarked police car. As he approached Nicole’s Market, located to his right as he traveled on Essex Street, a car pulled out of the market’s parking lot at a rapid speed. The car crossed over the sidewalk apron and began to pull out into traffic, almost hitting Capt. Gilligan’s car. Capt. Gilligan estimated that the car left the market’s parking lot at fifteen miles per hour.
Capt. Gilligan testified he had entered and exited Nicole’s Market’s parking on previous occasions. He stated that it is difficult to see oncoming traffic when exiting because of a fence that runs between Nicole’s Market and the property beside the market, located to the left of an exiting driver. On this occasion, both Capt. Gilligan and the driver of the other vehicle, Joseph Oreto, were forced to stop abruptly to avoid a collision. Oreto’s car rocked forward, causing him to inadvertently honk the horn. He then intentionally honked the horn at Capt. Gilligan. Oreto made an obscene gesture and yelled out the window of his car at the officer. At that point, Capt. Gilligan rolled down his window and asked Oreto to pull his vehicle over. Oreto did so, and Capt. Gilligan pulled up behind him.
Capt. Gilligan exited his vehicle and approached Oreto’s vehicle, observing both Oreto and his passenger, seated in the front passenger seat. Capt. Gilligan saw that the passenger was on his cell phone, holding a leather folder and moving papers in and out of the folder. The passenger, identified at the suppression hearing by Capt. Gilligan as Daniel Hibbard, was also talking to Oreto. When Capt. Gilligan approached, Hibbard began talking to him as well. Hibbard started to explain that Oreto thought he knew Capt. Gilligan, and “it was a mistake.” Capt. Gilligan did not respond. He requested Oreto’s license and registration. When he received them he returned to his car. Upon conferring with dispatch, Capt. Gilligan learned that Oreto had an outstanding warrant from Salem District Court. The address for the warrant, however, was different from the address on Oreto’s license. Capt. Gilligan returned to Oreto’s car and asked him if he had ever lived at the address listed on the warrant. Oreto said he had but denied knowing about the warrant. Hibbard explained that the warrant was for Oreto’s son, and that he, Hibbard, did not have any warrants out for his arrest. Hibbard told Capt. Gilligan he could call Chelsea District Court and confirm that he did not have any outstanding warrants. Hibbard appeared nervous and excited, spoke rapidly, continued to shuffle his papers in the leather folder and moved items around the front seat of the car.
When Capt. Gilligan returned to his car, he noticed that Hibbard continued to move items in the car, reaching into the backseat, stuffing a sandwich-size plastic bag into the ashtray area, stuffing a large manila envelope in a pocket behind the driver’s seat, and trying to stuff an item under the backseat. Hibbard then exited Oreto’s vehicle and walked towards Nicole’s Market. Capt. Gilligan exited his car and told Hibbard to stop. Hibbard stopped and turned sideways towards Capt. Gilligan. Capt. Gilligan asked him where he was going, and Hibbard replied “to the store.” Capt. Gilligan told him to get back into the vehicle until the stop was complete. Hibbard hesitated and then did so. Capt. Gilligan followed Hibbard and asked him if he would be able to drive Oreto’s car. Hibbard said his license was expired. Capt. Gilligan asked Hibbard to produce his license so that he could check its status. Hibbard first presented his business card, but eventually gave Capt. Gilligan his license.
Capt. Gilligan returned to his car for a third time and ran Hibbard’s information through the control desk. He found that Hibbard’s license was invalid, as Hibbard indicated, and that there was a warrant for his arrest. Capt. Gilligan returned to Oreto’s vehicle and informed both men that he was placing them under arrest. By this time, Officer Robert Phelan of the Salem Police had arrived.[1] Capt. Gilligan determined that the car had to be towed and that he needed to inventory the vehicle. Prior to its removal, Capt. Gilligan performed a cursory search of the vehicle. He found a bag of coins and pills in the ashtray. Oreto, from the back of the police cruiser, explained that the pills were Ambien and that he had a prescription for them. Capt. Gilligan also looked at the other items that Hibbard had been moving around during the stop. Behind the driver’s seat, sitting on top of the manila envelope containing paperwork, Capt. Gilligan saw a bag of cocaine. He then searched the rest of the back seat and found several small boxes. One of the boxes underneath the driver’s seat was open and Capt. Gilligan removed it from the car. Inside he found glassine bags of rock cocaine.
Capt. Gilligan next searched the trunk. He found a large number of items such as t-shirts and tools that he believed Hibbard used for his tree service. Due to the large volume of items to be inventoried, Capt. Gilligan decided that he could not perform the inventory on the street and had the vehicle towed to the police station. The vehicle was placed in the station garage until later that day, when Capt. Gilligan completed the inventory.
*230 This court finds Capt. Gilligan’s testimony credible and finds that it is supported by the photographs submitted as exhibits by both parties.
Rulings of Law
I.The Validity of the Traffic Stop
Hibbard’s first argument in support of suppression is that Capt. Gilligan did not have a valid basis for the traffic stop. In his brief, Hibbard argues that Oreto could not have exited the parking lot of Nicole’s Market at a speed of fifteen miles per hour because: (1) the parking lot is too small and in too close a proximity to a traffic light; and, (2) at a speed of fifteen miles per hour it would be impossible for Oreto to stop with his car still partially in the parking lot. As stated above, this court finds Capt. Gilligan’s testimony to be credible and will rely on his account of the incident with Oreto. Also, the Commonwealth admitted several photos of Nicole’s Market’s parking lot and it is not so small and compact that it would be in “no way possible” for Oreto have sped out of the lot at fifteen miles per hour.
Hibbard’s contention that Oreto could not have stopped the car while still partially in the parking lot and without hitting Capt. Gilligan’s car is equally unsupported by the evidence. The aerial photograph of Nicole’s Market, marked as exhibit 1, shows that there are parking spaces along the front of Nicole’s, but the lot extends down the right side of Nicole’s, allowing vehicles to travel to stores located behind Nicole’s. In addition, the roadway in front of Nicole’s has a parking lane and two travel lanes; it is not so narrow a roadway that Oreto could not have exited without hitting Capt. Gilligan’s car. Therefore, Hibbard’s contention is not tenable.
Hibbard also argues that the traffic stop was imper-missibly pretextual because Capt. Gilligan’s true reason for pulling Oreto over was that he was “disgruntled” by Oreto’s rude gesture and honking. This argument fails as well. The testimony provided by Capt. Gilligan provides sufficient evidence to support a traffic stop based on excessive speed and driving to endanger. Massachusetts adheres to an “authorization test” to determine the validity of a traffic stop. Commonwealth v. Santana, 420 Mass. 205, 209 (1995). Under the authorization test, it is irrelevant whether or not a police officer would have made the stop if not for the unlawful motive; all that matters is that the stop was objectively reasonable, regardless of motive. Id. at 209. In addition, a stop is only “pre-textual” if an officer relies on “a legal justification to make a stop in order to search a person or place, or interrogate a person, for an unrelated serious crime for which they do not have reasonable suspicion to support a stop." U.S. v. Guzman, 864 F.2d 1512, 1515 (10th Cir. 1988), quoted by Santana, 420 Mass. at 209-10.
Here, Hibbard argues that the stop was an invalid pretextual stop because Capt. Gilligan was disgruntled and wanted to pull Oreto over “because he could.” In light of the testimony from Capt. Gilligan, it is clear that he had authorization to pull Oreto over for operating his vehicle in a dangerous manner, even if Capt. Gilligan was “disgruntled.” In addition, his stop was not pretext to investigate an unrelated serious crime. Therefore, Capt. Gilligan performed a valid traffic stop.
II.Oreto’s Warrant Status
Hibbard next argues that the evidence found in Oreto’s car must be suppressed because Capt. Gilligan exceeded the scope of the traffic stop when he checked Oreto’s warrant status. It is well settled that a routine traffic stop ends upon the production of a valid license and registration. Commonwealth v. Torres, 424 Mass. 153, 158 (1997). Here, Capt. Gilligan conducted a routine check of the vehicle registration and driver’s license and in doing so learned that Oreto had an outstanding warrant. From this testimony, it appears that in the course of a routine validation of the license and registration Capt. Gilligan happened to learn of the warrant; he did not make a specific inquiry. See Commonwealth v. Laaman, 25 Mass.App.Ct. 354, 363-64(1988) (lawful for Trooper to ask for license and take it back to cruiser with him while he made “routine inquiries over the radio”). Because Capt. Gilligan did not make inquiries beyond the standard validation of the license and registration, he did not impermissibly exceed the scope of the traffic stop.
III.Capt. Gilligan’s Order to Hibbard to Return to the Vehicle
Finally, Hibbard argues that Capt. Gilligan’s order to him to return to Oreto’s vehicle constituted a seizure without probable cause, and therefore any evidence obtained after that illegal seizure must be suppressed. A person is seized or detained if, under the circumstances, a reasonable person would not believe he was free to leave. Torres, 424 Mass. at 158, citing U.S. v. Mendenhall, 446 U.S. 544, 554 (1980). In traffic stops, an officer must end the stop upon the operator’s production of a valid license and registration. Torres, 424 Mass. at 158. If, however, the officer has grounds to believe that “either the operator or his passengers were involved in the commission of a crime ... or engaged in other suspicious conduct," he may continue to detain them beyond the normal traffic stop. Id. If an officer extends a traffic stop beyond that initial inquiry, he “must reasonably believe that there is further criminal conduct afoot, and that belief must be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer’s experience.” Commonwealth v. Feyenord, 445 Mass. 72, 77 (2005).
Here, the stop did not end when Oreto produced (and Capt. Gilligan verified) a valid license and registration because Oreto had a warrant. Capt. Gilligan returned to the vehicle after verifying the license and registration so that he could question Oreto about the warrant and the apparent discrepancy in his address. *231 Hibbard then volunteered that he didn’t have any outstanding warrants and told Capt. Gilligan to call Chelsea District Court to find out. Hibbard also spoke rapidly and nervously, shuffled papers in his leather binder, and moved items around the front seat of the car. Capt. Gilligan then returned to his car and from there observed Hibbard pick up a sandwich-size plastic bag and place it in the ashtray area of the car. He also observed Hibbard stuff a manila envelope behind the driver’s seat and stuff another item under the backseat. Hibbard then exited the vehicle. When Capt. Gilligan approached him and told him to go back to the car until the stop was complete, Hibbard hesitated.
As Hibbard correctly argues, it is at this point— when Capt. Gilligan told Hibbard he could not leave— that the seizure of Hibbard occurred. Hibbard is incorrect, however, when he claims that Capt. Gilligan did not have probable cause to detain him. Hibbard’s cumulative behavior up until this point was sufficiently suspicious to allow Capt. Gilligan to detain him beyond the usual traffic stop, particularly in light of Oreto’s warrant and Hibbard’s nervous comments that he did not have any warrants. See Feyenord, 445 Mass. at 78 (officer’s suspicion of criminal activity was reasonable and extension of traffic stop and detention was permissible where defendant provided inconsistent statements of his identity and destination, failed to produce a valid driver’s license, and exhibited nervous behavior).
While it is true that nervous or furtive movements in isolation do not supply reasonable suspicion of criminal activity, such behavior in context with other details may be sufficient to establish probable cause. Commonwealth v. DePeiza, 449 Mass. 367, 372 (2007) (“stiff arm’’ movement of defendant when walking, in context of circumstances, gave officers sufficient probable cause for investigatory stop). Hibbard exhibited nervous behavior from the moment Capt. Gilligan approached the vehicle and his behavior escalated as Capt. Gilligan investigated Oreto. Hibbard’s suspicious behavior culminated with him exiting the vehicle and walking away while the traffic stop was ongoing. Capt. Gilligan’s testimony establishes that he did not detain Hibbard on a mere hunch. See DePeiza, 449 Mass. at 373. On the contrary, the totality of Hibbard’s behavior, particularly moving items in the vehicle out of sight, displaying a plastic bag, and walking away from the vehicle, was sufficiently suspicious to support a finding that Capt. Gilligan had probable cause to detain him. Compare Torres, 424 Mass. at 158-59 (reversing trial court’s finding of a lawful seizure based solely on the passenger’s “unusual behavior” of exiting the car).
Capt. Gilligan’s subsequent request for identification from Hibbard was also permissible. Upon verifying Hibbard’s license, Capt. Gilligan discovered that Hibbard also had an outstanding warrant. He then arrested Oreto and Hibbard and searched the vehicle pursuant to their arrests. See Commonwealth v. Ciaramitaro, 51 Mass.App.Ct. 638, 642 (2001) (reasonable suspicion of drug or alcohol use permitted proportional detention, which led to discovery of plain-view contraband, which led to probable cause to arrest defendant and search vehicle).
The Commonwealth has met its burden of establishing that Capt. Gilligan was authorized to make the traffic stop of Oreto’s vehicle and that he had a legitimate reason to extend the routine traffic stop upon discovering Oreto’s warrant. The Commonwealth has also established by a preponderance of the evidence that Hibbard’s suspicious behavior provided Capt. Gilligan with probable cause to detain him.
ORDER
It is therefore ordered that the defendant’s Motion to Suppress be DENIED.

Capt. Gilligan testified that he could not remember when he called for back up; it was either at the time Hibbard exited Oreto’s vehicle or when Capt. Gilligan returned to his cruiser with Hibbard’s information.